257 F.3d 74 (2nd Cir. 2001)
 FRIENDS OF GATEWAY, FLOYD BENNETT FIELD GARDENS ASSOCIATION, BARREN ISLAND MARINA BOATERS ASSOCIATION, PENNSYLVANIA AVENUE RADIO CONTROL SOCIETY OF GATEWAY NATIONAL PARK, and EDUCATORS OF GATEWAY, Petitioners,
v.
RODNEY SLATER, Secretary of Transportation, JANE F. GARVEY, Administrator, Federal Aviation Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL AVIATION ADMINISTRATION, Respondents.
 Docket No. 99-4081.
August Term, 1999.
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: March 9, 2000.
Decided: July 09, 2001.
 
 Petition for review of the March 29, 1999 decision of the Federal Aviation Administration ("FAA"), approving installation of a radar tower on FAA-administered land within the boundaries of Gateway National Recreation Area.
 PETITION DENIED.
 Judge Cardamone dissents in a separate opinion.
 John Minardo, BLS LEGAL SERVICES CORP., Federal Litigation Program, Brooklyn, NY, for Petitioners.
 Jeff C. Dobbins, United States Department of Justice, Washington, DC, for Respondents.
 Before: CARDAMONE, MCLAUGHLIN, PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Friends of Gateway, Floyd Bennett Field Gardens Association, Barren Island Marina Boaters Association, Pennsylvania Avenue Radio Control Society of Gateway National Park, and Educators of Gateway petition for review of the March 29, 1999 order (the "Order") of the Federal Aviation Administration (the "FAA"), authorizing the installation of a Terminal Doppler Weather Radar System (the "Radar Tower" or "TDWR") on FAA-administered land at Floyd Bennett Field ("Floyd Bennett Field" or the "Field"), within the boundaries of Gateway National Recreation Area ("Gateway"). Petitioners argue that § 460cc-2(e) of the Gateway National Recreational Area Act of 1972, Pub. L. No. 92-592 (October 27, 1972), codified at 16 U.S.C. §§ 460cc to 460cc-4 (the "Gateway Act"), prohibits the installation of the Radar Tower on any property at Floyd Bennett Field within the boundaries of Gateway. The FAA argues, inter alia, that its use of its own land within the boundaries of Gateway is not restricted by § 460cc-2(e). For the following reasons, we affirm the decision of the FAA to site the Radar Tower on its property at Floyd Bennett Field.
 
 I. BACKGROUND
 
 2
 A. Floyd Bennett Field and Gateway National Recreation Area
 
 
 3
 Floyd Bennett Field was built in 1930 as New York City's first municipal airport. In 1936, New York City leased approximately ten acres of property on the eastern part of the Field to the United States Coast Guard (the "Coast Guard Air Station"). In May 1941, New York City leased the remainder of the Field to the United States Navy. In November 1941, President Roosevelt transferred the Coast Guard to the Department of the Navy. During World War II, the entire Field was ceded to the United States Navy for the purpose of creating the Naval Air Station, Floyd Bennett Field. Thus, by 1943, the entire Field was under the jurisdiction of the Department of the Navy.
 
 
 4
 On January 1, 1946, the Coast Guard was transferred to the Department of the Treasury and on April 1, 1967, the Coast Guard was transferred to the newly formed Department of Transportation ("DOT"). In 1971, the Naval Air station was decommissioned, but the Coast Guard Air Station remained in operation under the jurisdiction of the DOT.
 
 
 5
 In 1972, Congress established Gateway as one of two "urban parks," the other being Golden Gate National Recreation Area ("Golden Gate") in San Francisco. See Gateway Act; Golden Gate National Recreation Area Act of 1972, Pub. L. 92-589 (October 27, 1972), codified at 16 U.S.C. §§ 460bb to 460bb-5 (the "Golden Gate Act"). Floyd Bennett Field was included within the boundaries of the Jamaica Bay Unit of Gateway. See 16 U.S.C. § 460cc(a)(1). Upon enactment of the Gateway Act, the Department of the Interior ("DOI") took over administration of the Field, except the portion administered by the Coast Guard as the Coast Guard Air Station and another section administered by the Armed Forces Reserve. The Gateway Act permitted the agency with control over these non-DOI federal enclaves to continue using the property until such time, if ever, as that agency decided to transfer administration of the property to the DOI. See 16 U.S.C. § 460cc-1(b); Natural Resources Defense Council, Inc. v. Marsh, 836 F.2d 87, 88 (2d Cir. 1987) (interpreting Gateway Act); Gateway General Management Plan.
 
 
 6
 In 1997, the DOT, as the parent agency of both the Coast Guard and the FAA, reassigned, from the Coast Guard to the FAA, 1.8 acres in the middle of the Coast Guard Air Station (the "FAA Property"). Petitioners do not challenge this interdepartmental transfer. In 1998, the DOT transferred administration of the remainder of the property under its control (not including the 1.8 acre parcel) to the DOI; the DOI then leased the property to the New York City Police Department for use as a home base for its helicopters for the next 25 years. The proposed site for the Radar Tower is on the 1.8 acres of FAA Property.
 
 B. Choosing the Site for the Radar Tower
 
 7
 In 1975, Eastern Airlines Flight 66 crashed at John F. Kennedy International Airport ("JFK"), killing 112 people. One of the causes of the accident was a type of low-altitude wind shear called a "microburst," which is a small but powerful downward rush of cold air that spreads out as it reaches the ground. A microburst can cause the wind direction to shift 180 degrees several times within the space of a few miles. An aircraft passing through a microburst is in extreme danger. The aircraft will encounter a strong headwind, causing the pilot to compensate by changing altitude or throttling back. As the plane passes through the center, the wind turns into a tail wind, decreasing lift and resulting in loss of altitude and control. Occasionally, this results in an aircraft being pushed into the ground. By 1983, microbursts and other wind shear had resulted in 28 airline accidents. In 1985, 137 people died near the Dallas-Fort Worth airport when an American Airlines aircraft crashed as a result of an undetected microburst.
 
 
 8
 After the risks associated with these weather patterns became clear, the FAA began developing a detection system in conjunction with public and private researchers. Microbursts are very difficult to detect using conventional radar systems. The Terminal Doppler Weather Radar System ("TDWR") combines standard radar with the Doppler effect[1] to effectively detect wind shear and developing microbursts. TDWR warns air traffic controllers of these conditions several minutes before an aircraft enters the area. It is comprised of a steel-lattice tower, 87 feet high by 17 feet square, topped by a white "radome" that shields the antenna from weather and birds. It also includes a small building at the base of the tower to house computer systems used to gather and evaluate distance and speed information and transmit it to air traffic controllers.
 
 
 9
 These radar systems have been installed near airports all over the country and Congress has been clamoring for the FAA to install one for JFK and LaGuardia Airport ("LaGuardia"). See S. Rep. 104-126, at 53 (1995) ("The Committee is extremely concerned that the FAA has made no progress on siting... the TDWR...."). Initially, Congress funded two Radar Towers to serve JFK and LaGuardia, one for each airport. SeeJ.A. Volume II (Final Environmental Impact Statement ("EIS"))[2] at 6. In 1993, the FAA completed environmental assessments and reached preliminary conclusions regarding preferred locations. Congress and the local community opposed the FAA's choices because both were very close to residential neighborhoods. As a result, the FAA began reconsidering its conclusions. During that time, Congress decided that one Radar Tower could serve both JFK and LaGuardia, see id., and it earmarked the funds for the surplus system to be installed at McCarran International Airport in Las Vegas, Nevada. As a result, the FAA was required to locate a new site that would provide the proper coverage for JFK and LaGuardia airports. See id.
 
 
 10
 In 1995, the FAA began the technical evaluation and environmental impact review of sites for the single Radar Tower. The result of the FAA's work was a 1999 Final Environmental Impact Statement, the EIS. The EIS reviews several possible locations and alternatives to installation of the Radar Tower. The EIS concludes that the best alternative is installation of the Radar Tower at Floyd Bennett Field. According to the EIS, installing the Radar Tower at Floyd Bennett Field provides the best possible coverage for both airports, presents none of the maintenance concerns of an island or offshore facility, and has no significant environmental impact. The proposed site is already closed to the public; the nearest residences are one and one half miles away; the public gardens are more than a mile away; and there is a 200 foot National Park Service ("NPS") radio tower one quarter of a mile away. Furthermore, the site is already being used as an air facility, and the site is on land already being administered by the FAA.
 
 
 11
 After the required notice and comment period under the Administrative Procedures Act, on March 30, 1999, the FAA issued the Order and the record of decision, which concluded that the Radar Tower should be placed on the FAA Property at Floyd Bennett Field. See 64 Fed. Reg. 16516 (1999)(announcing issuance of record of decision and EIS, and announcing that "by order of the Administrator a single TDWR will be installed at U.S. Coast Guard Air Station Brooklyn site"). Petitioners filed a timely petition for review in this Court.
 
 II. DISCUSSION
 A. Jurisdiction
 
 12
 This Court has jurisdiction to review a decision of the FAA pursuant to 49 U.S.C. § 46110(a), which provides in relevant part that
 
 
 13
 a person disclosing a substantial interest in an order issued by... the Administrator of the Federal Aviation Administration... may apply for review of the order by filing a petition for review in the... court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued.
 
 
 14
 49 U.S.C. § 46110(a). Once the petition is before the Court, the Court
 
 
 15
 has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the... Administrator to conduct further proceedings. After reasonable notice to the... Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary or Administrator, if supported by substantial evidence, are conclusive.
 
 
 16
 Id. § 46110(c).
 
 
 17
 The Supreme Court has stated, however, that Congress cannot create Article III standing by statute. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 576-78 (1992). Furthermore, the Supreme Court recently decided that this Court must address any jurisdictional standing question first, before deciding a case on the merits. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94 (1999) ("The Ninth Circuit [and the Second Circuit have] denominated this practice--which [they] characterize[] as 'assuming' jurisdiction for the purpose of deciding the merits--the 'doctrine of hypothetical jurisdiction.' We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers.") (citations omitted) (footnote omitted). Although respondents do not challenge petitioners' Article III standing, we must nevertheless take it upon ourselves to determine whether we have jurisdiction over this case.
 
 
 18
 The petitioners in this case allege that they frequently and regularly use areas of Gateway that would be affected by expansion of airway facilities within the park, and that they have an interest in having their use preserved. In addition, petitioners contend that their recreational use would be affected by the eyesore that is this Radar Tower. Thus, petitioners have presented sufficient allegations to support their standing to petition for review of the FAA Order. See United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 687-90 (1973); Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).
 
 
 19
 B. Section 460cc-2(e) does not restrict the FAA's use of the FAA Property
 
 
 20
 Petitioners argue that the FAA Order violates 16 U.S.C. § 460cc-2(e), which provides:
 
 
 21
 The authority of the Secretary of Transportation to maintain and operate existing airway facilities and to install necessary new facilities within the recreation area shall be exercised in accordance with plans which are mutually acceptable to the Secretary of the Interior and the Secretary of Transportation and which are consistent with both the purpose of this subchapter and the purpose of existing statutes dealing with the establishment, maintenance, and operation of airway facilities: Provided, That nothing in this section shall authorize the expansion of airport runways into Jamaica Bay or air facilities at Floyd Bennett Field.
 
 
 22
 16 U.S.C. § 460cc-2(e). Focusing on the last sentence in this section (the "Proviso"), petitioners claim that the plain meaning of the statute compels the conclusion that installing the Radar Tower is an "expansion" of "air facilities" at Floyd Bennett Field.[3]
 
 
 23
 The FAA argues that: (1) the plain meaning of § 460cc-2(e) does not support a reading that prohibits installation of the Radar Tower at Floyd Bennett Field; (2) the legislative history of the Gateway Act reinforces the FAA's interpretation of § 460cc-2(e) as prohibiting only physical encroachment by airports into park lands; (3) the Gateway Act as a whole and its legislative history support a reading that the use-restriction of § 460cc-2(e) does not apply to FAA-administered property; and (4) the FAA-administered property is not within the recreation area and therefore the Gateway Act does not apply at all. Because we agree with the FAA that the use-restriction of § 460cc-2(e) does not apply to the FAA Property, we do not address the FAA's other arguments.
 
 
 24
 As petitioners contend, we review the FAA's interpretation of the statutory language de novo. Petitioners cite only one case in their brief, Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Chevron stands for the proposition that a court must construe a statute in accordance with its plain meaning and the intent of Congress, see id. at 859-62, and also for the proposition that a Court owes deference to an agency's interpretation of a statute only if it is an enabling statute for that agency, see id.at 844-45 ("'If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'") (emphasis added) (quoting United States v. Shimer, 367 U.S. 374, 382, 383 (1961)). The Gateway Act is not an enabling statute for the FAA. Thus, as petitioners argue, the FAA's "choice" to site the Radar Tower at Floyd Bennett Field cannot be a "reasonable accommodation of conflicting policies" committed to the FAA by the Gateway Act, and we interpret the statute without deference to the FAA's interpretation.
 
 
 25
 Looking at the overall structure and the legislative history of the Gateway Act, we conclude that Congress did not intend to restrict the use of federal land that is located within the boundaries of Gateway pursuant to § 460cc(a) but not yet acquired by the DOI pursuant to § 460cc-1. The Gateway Act consists of five sections, only three of which are relevant to this case: (1) "Establishment," 16 U.S.C. § 460cc; (2) "Acquisition of property," id. § 460cc-1; and (3) "Administration," id. § 460cc-2.[4] Section 460cc establishes the "[c]omposition and boundaries" of Gateway, including within its boundaries the Jamaica Bay Unit, which in turn includes "Floyd Bennett Field." Id. § 460cc(a)(1). Section 460cc-1 authorizes the DOI to acquire in various ways the lands and waters "within the boundaries of the recreation area." Id. § 460cc-1(a) & (b). In § 460cc-1(a), Congress authorized the DOI to acquire lands and waters "[w]ithin the boundaries of the recreation area," or interests therein, from individuals and the states of New York and New Jersey. Id. § 460cc-1(a). In § 460cc-1(b), Congress authorized the transfer, at the discretion of the federal agency having custody, of "any Federal property within the boundaries of the recreation area... to the administrative jurisdiction of the [DOI] for administration as part of the recreation area." Id. § 460cc-1(b). Section 460cc-2 directs the DOI to administer the recreation area "in accordance with" the other sections of the Gateway Act. Id. § 460cc-2(a).
 
 
 26
 These sections read together indicate that lands and waters within the boundaries of the recreation area pursuant to § 460cc, but not yet acquired by the DOI pursuant to § 460cc-1(a) or (b), are not part of the recreation area, and are not subject to "administration" pursuant to § 460cc-2. More specifically, § 460cc-1(b) indicates that the non-DOI federal enclaves within the boundaries of the recreation area are not part of the recreation area, and are not subject to "administration" pursuant to § 460cc-2. Once we determine that property administered by federal agencies other than the DOI is neither "part" of Gateway nor subject to administration pursuant to § 460cc-2, it follows that § 460cc-2 does not apply to those agencies' use of that property.[5]
 
 
 27
 That Congress intended to leave enclaves within the boundaries of Gateway that would not be subject to the use-restrictions covering the land administered as part of the recreation area is supported by the concurrent enactment of the Golden Gate Act. See Marsh, 836 F.2d at 90 (relying heavily on the differences between the Gateway Act and the Golden Gate Act in interpreting § 460cc-1(b) of the Gateway Act). The original bills for both the Gateway and Golden Gate Acts required that federal lands be transferred to the DOI upon enactment, and required that the DOI allow existing uses by other federal agencies for as long as "reasonably required to fulfill the mission assigned to [the lands]." H.R. Rep. No. 92-1392 (1972), reprinted in 1972 U.S.C.C.A.N. 4882, 4889 (the "Gateway House Report"); see H.R. Rep. No. 92-1391, reprinted in 1972 U.S.C.C.A.N. 4850, 4857 (discussing proposed Golden Gate legislation). Only the Golden Gate Act, however, ultimately provided for such automatic transfer of most federal lands within the boundaries of Golden Gate, see 16 U.S.C. § 460bb-2 (section on "Acquisition"), and for the DOI's administration of these lands "acquired for the recreation area." Id. § 460bb-3(a) (section on "Administration"). The Golden Gate Act required the DOI to allow the continuation of existing uses of land formerly held by other agencies. Seeid. § 460bb-2(a). In contrast, the Gateway Act provided that federal agencies holding federal lands within the boundaries of Gateway may transfer those lands, and that only at that point would those lands be administered by the DOI as part of Gateway. See id. § 460cc-1(b).
 
 
 28
 Furthermore, whereas the Golden Gate Act clearly restricted the use of lands "under the administrative jurisdiction of a department other than [the DOI]," id. § 460bb-2(i) ("New construction and development within the boundaries described in § 460bb-1(a) of this title on lands under the administrative jurisdiction of a department other than [the DOI] is prohibited, except that improvements on lands which have not been transferred to [the DOI's] administrative jurisdiction may be reconstructed or demolished."), the Gateway Act never similarly restricted the use of lands under the administrative jurisdiction of a federal agency other than the DOI. If Congress had wanted to restrict the use of federal lands held by other agencies within the boundaries of Gateway, Congress could have provided for such restrictions as it did in the Golden Gate Act. As the Golden Gate Act demonstrates, Congress knew how to implement such restrictions if it so desired. Instead, Congress chose in the Gateway Act to leave the use of non-transferred federal lands within the boundaries of Gateway to the discretion of the holding agency.
 
 
 29
 We also find it persuasive that in the one place where the Golden Gate Act uses the identical restrictive terminology used in § 460cc-2(e) of the Gateway Act, the restrictions on activities "within the recreation area" clearly refer only to lands already transferred to the DOI for administration as part of the park. See id. § 460bb-2(g). Section 460bb-2(g) provides:
 
 
 30
 When this property is determined to be in excess to the needs of the Coast Guard, it shall be transferred to the jurisdiction of the [DOI] for purposes of this subchapter [ i.e., Administration]. The Coast Guard may continue to maintain and operate existing navigational aids: Provided, That access to such navigational aids and the installation of necessary new navigational aids within the recreation area shall be undertaken in accordance with plans which are mutually acceptable to the [DOI] and the [DOT] and which are consistent with both the purposes of this subchapter and the purpose of existing statutes dealing with establishment, maintenance, and operation of navigational aids.
 
 
 31
 Id. § 460bb-2(g). In this section, "within the recreation area" refers to lands "transferred to the jurisdiction of the [DOI] for purposes of [administering Golden Gate]." Id. Congress presumably meant the same when it used the identical language in the Gateway Act to restrict the DOT's authority to maintain, operate, and install air facilities "within the recreation area." Id. § 460cc-2(d) & (e). Although the restrictions in the Gateway Act are not preceded by language mandating the transfer of certain land to the DOI, that is because the Gateway Act does not mandate the transfer of any land to the DOI. See Marsh, 836 F.2d at 90.[6]
 
 
 32
 The legislative history of the Gateway Act, and particularly § 460cc-2(d)[7] and (e), also supports our interpretation of the statute. In officially responding to several proposed bills for establishing Gateway, the Department of the Army made clear that much of the existing military lands were still needed for military purposes or would be transferred to the Coast Guard for the DOT's purposes, and that the Gateway Act should not interfere with that use. See Gateway House Report, 1972 U.S.C.C.A.N. at 4901-02, 4905. The Department of the Army also suggested that the Gateway Act include a section providing for mutual agreement between the DOI and the Army Corps of Engineers with regard to water resource development. See id. at 4905. Similarly, the DOI suggested that the legislation provide for mutual agreement between the DOI and the DOT with regard to maintaining and expanding JFK. See id. at 4901. The House's response, section 3 of the proposed bill, is described in the Gateway House Report as dealing "with the administrative authority of the [DOI].... [I]t permits the [DOI] to establish working arrangements with the Secretaries of the Army and Transportation with respect to functions which are compatible with the purposes of this legislation." See id. at 4892 (emphasis added). This reference to "permitting" the DOI to "establish working arrangements" became § 460cc-2(d) and (e). This legislative history indicates that these sections were meant to provide for the Army's and the DOT's agreement with the DOI before acting within their otherwise available authority, i.e., pursuant to "existing statutes," 16 U.S.C. § 460cc-2(d) & (e), in such a way that would affect land administered by the DOI. These sections were not intended to interfere with the Army's military use of the land it retained or the DOT's use of the land the Army transferred to it.
 
 
 33
 Several official DOI acts and DOI documents also support this reading of §§ 460cc-1(b) and 460cc-2(e). In 1994, for example, the DOI, through the NPS, officially revised the boundaries of Gateway "because Fort Wadsworth is being transferred to the [NPS] as a result of the closure of Naval Station New York." 59 Fed. Reg. 43588 (1994). Although Fort Wadsworth was already entirely "within the boundaries" of the Recreation Area pursuant to § 460cc(a)(4), the DOI nevertheless found that certain portions of Fort Wadsworth were "not suitable for inclusion in Gateway National Recreation Area," id. at 43588 (emphasis added), and did not include them in the park. This finding of the DOI implies that before transfer, the property was not yet part of Gateway. In addition, the NPS's 1979 Gateway General Management Plan stated that certain non-DOI federal "enclaves," including the Coast Guard Property at Floyd Bennett Field, are "excluded properties." The NPS's 1983 Development Concept Plan for Floyd Bennett Field depictsthe Coast Guard property and other non-DOI federal enclaves as separate from the recreation area lands at Floyd Bennett Field.
 
 
 34
 Finally, this Court has characterized § 460cc-1(b) as creating non-DOI federal enclaves not included within the recreation area. See Marsh, 836 F.2d at 88 (discussing the transfer of property from the Army to the DOI "for inclusion in the recreation area"). Marsh held that the Army could transfer property under its jurisdiction to the Navy rather than the DOI: "Although the Gateway Act includes Fort Wadsworth within the boundaries of the Gateway National Recreation Area, the Act specifies no time for the Fort's transfer to the [DOI] and imposes no limitations on the Department of Defense's intervening use." Id. at 90 (emphasis added). The Court reached this conclusion notwithstanding § 460cc-2(d)'s requirement that the Department of the Army consult and agree with the DOI in its water resources development activities "within the recreation area." 16 U.S.C. § 460cc-2(d). Consistent with Marsh, we conclude that the Gateway Act likewise imposes no limitations on the DOT's intervening use of its own property, even though § 460cc-2(e) requires the DOT to consult and agree with the DOI in its air facility development activities "within the recreation area." Id. § 460cc-2(e).
 
 III. CONCLUSION
 
 35
 For the foregoing reasons, we hold that § 460cc-2(e) does not apply to the FAA's use of its own property and therefore does not prohibit the FAA from exercising its otherwise existing authority to install the Radar Tower on the FAA Property at Floyd Bennett Field. Neither does § 460cc-2(e) require the FAA to reach agreement with the DOI in order to exercise that authority. We therefore affirm the FAA Order.
 
 
 36
 We note that the FAA has filed a motion for reconsideration of its motion requesting that we take judicial notice of the now existing agreement between the DOT and the DOI concerning installation of the Radar Tower. Because we conclude that § 460cc-2(e) is inapplicable, the agreement between the DOI and DOT was unnecessary to the FAA's decision. The existence of the agreement is therefore irrelevant to our determination. The FAA's motion for reconsideration is denied.
 
 
 
 NOTES:
 
 
 [1]
 "Doppler effect" refers to changes in wavelength and frequency of a wave as a result of the motion of the source of the waves. These changes in waves are analyzed to measure the velocity and distance of remote objects. See Webster's Third New International Dictionary 675 (1981).
 
 
 [2]
 Instructions on how to obtain a copy of the EIS appear at 64 Fed. Reg. 16516 (1999).
 
 
 [3]
 Petitioners argue in the alternative (for the first time in their Reply Brief) that, even if installation of the Radar Tower at Floyd Bennett Field is not an expansion of air facilities prohibited by the Proviso, § 460cc-2(e) otherwise requires the DOT to come to an agreement with the DOI when exercising the authority "to maintain and operate existing airway facilities and to install necessary new facilities within the recreation area." Petitioners argue that the FAA violated the statute by failing to establish a plan that was mutually acceptable to the DOT and the DOI before providing for notice and comment and reaching a decision on its proposed site.
 First, petitioners waived this alternative argument by not raising it prior to filing their Reply Brief, and by inadequately raising it there. Second, the argument is irrelevant because we hold that § 460cc-2(e) does not apply to the FAA's use of the FAA Property at Floyd Bennett Field.
 
 
 [4]
 The other two sections are entitled "Gateway National Recreation Area Advisory Commission," id. § 460cc-3, and "Authorization of appropriations; limitation; adjustments," id. § 460cc-4.
 
 
 [5]
 The dissent contends that our reading of this provision renders the provision "nonsensical." This provision, however, explicitly distinguishes between those lands "within the boundaries of the recreation area" but controlled by another federal agency and those lands that are "part of the recreation area" and within the "administrative jurisdiction of the [DOI]." 16 U.S.C. § 460cc-1(b) (emphasis added.) The dissent equates these two terms, by asserting that the DOT and the DOI have joint jurisdiction over the 1.8 acres of FAA property within the boundaries of the recreation area although this property has not been transferred to the DOI, and thus concludes that § 460cc-2(e) applies to this property. Such a reading renders the distinction that Congress outlined in § 460cc-1(b) without meaning, because it grants to the DOI jurisdiction over lands not yet transferred to it. We therefore conclude that Congress' explicit distinction in § 460cc-1(b) indicates its intent that lands not yet transferred pursuant to that section are not part of the administrative jurisdiction of the DOI.
 
 
 [6]
 The dissent correctly points out that § 460bb-2(g) "grants joint jurisdiction over the installation of new navigational aids 'within the recreation area.'" Dissent at 7. In concluding that § 460cc-2(e), in language similar to § 460bb-2(g), also grants joint jurisdiction to both the DOT and the DOI over the 1.8 acres of FAA property within the boundaries of Floyd Bennett Field, the dissent fails to recognize that § 460bb-2(g)'s grant of joint jurisdiction refers specifically to lands that have already been transferred (as is mandated by the Golden Gate Act) to the administrative jurisdiction of the DOI, and are thus "within the recreation area." Therefore, like § 460bb-2(g)'s grant of joint jurisdiction, § 460cc-2(e)'s grant of joint jurisdiction refers to lands that have been transferred to the administrative jurisdiction of the DOI and thus are "within the recreation area."
 The dissent relies, in part, on § 460cc-2(e)'s lack of explicit "temporal language" as contained in the Golden Gate Act's § 460bb-2(g). Dissent at 9. As we earlier stated, however, § 460bb-2(g) contains explicit temporal language because the Golden Gate Act, unlike the Gateway Act, mandated transfer of lands to the DOI immediately upon enactment of the Golden Gate Act. See 16 U.S.C. § 460bb-2(a). Section 460bb-2(g) is an exception to this policy, providing that the Coast Guard may retain jurisdiction over certain lands, but must transfer the property "when the property is determined to be excess to the needs of the Coast Guard." Therefore, language similar to § 460bb-2(g)'s provision that "[t]he Coast Guard may continue to maintain and operate existing navigational aids" is unnecessary in § 460cc-2(e) because § 460cc-2(e) does not contain any reference to the transfer of lands.
 
 
 [7]
 Section 460cc-2(d), entitled "Water resource developments," provides:
 The authority of the Secretary of the Army to undertake or contribute to water resource developments, including shore erosion control, beach protection, and navigation improvements... on land and/or waters within the recreation area shall be exercised in accordance with plans which are mutually acceptable to the Secretary of the Interior and the Secretary of the Army and which are consistent with both the purpose of this subchapter and the purpose of existing statutes dealing with water and related land resource development.
 
 
 
 37
 CARDAMONE, Circuit Judge, Dissenting from majority opinion:
 
 
 38
 In their challenge to the March 29, 1999 order of the FAA authorizing the installation of a Radar Tower at Floyd Bennett Field that lies wholly within the Gateway National Recreation Area (Gateway), petitioners argue that installation of the Radar Tower is prohibited by §460cc 2(e) of the Gateway National Recreation Area Act of 1972, Pub. L. No. 92-592, 86 Stat. 1308 (codified as amended at 16 U.S.C. §§460cc to 460cc-4) (Gateway Act). Because I agree with petitioners, I respectfully dissent from the majority's contrary conclusion.
 
 I Applicability of Section 460cc-2(e)
 
 39
 Petitioners' challenge relies entirely on §460cc-2(e) of the Gateway Act, which states
 
 
 40
 The authority of the Secretary of Transportation to maintain and operate existing airway facilities and to install necessary new facilities within the recreation area shall be exercised in accordance with plans which are mutually acceptable to the Secretary of the Interior and the Secretary of Transportation and which are consistent with both the purpose of this subchapter and the purpose of existing statutes dealing with the establishment, maintenance, and operation of airway facilities: Provided, That nothing in this section shall authorize the expansion of airport runways into Jamaica Bay or air facilities at Floyd Bennett Field.
 
 
 41
 16 U.S.C. §460cc-2(e) (1994) (first emphasis added).
 
 
 42
 The majority rejects petitioners' contention on the grounds that the term "recreation area" in the statute includes only lands that have been transferred to the administrative jurisdiction of the Secretary of the Interior, and that this provision simply does not apply to Floyd Bennett Field, which has not been so transferred. To the contrary, however, this reading of the term "recreation area" contradicts the plain language of the Gateway Act.
 
 
 43
 In particular, the opening section of the Gateway Act defines the term "recreation area" in relevant part as follows:
 
 
 44
 In order to preserve and protect for the use and enjoyment of present and future generations an area possessing outstanding natural and recreational features, the Gateway National Recreation Area (hereinafter referred to as the "recreation area") is hereby established.
 
 
 45
 (a) Composition and boundaries
 
 
 46
 The recreation area shall comprise the following lands, waters, marshes, and submerged lands in the New York Harbor area generally depicted on the map entitled "Boundary Map, Gateway National Recreation Area," numbered 951 40017 sheets 1 through 3 and dated May, 1972:
 
 
 47
 (1) Jamaica Bay Unit including all islands, marshes, hassocks, submerged lands, and waters in Jamaica Bay, Floyd Bennett Field, the lands generally located between highway route 27A and Jamaica Bay, and the area of Jamaica Bay up to the shoreline of John F. Kennedy International Airport;
 
 
 48
 ....
 
 
 49
 Id. § 460cc (emphases added).
 
 
 50
 Thus, the Gateway Act plainly provides that the term "recreation area" shall include all of the enumerated lands and waters, and not just those transferred to the administrative jurisdiction of the Secretary of the Interior. Indeed, the very section of the Gateway Act that allows for discretionary transfers of agency jurisdiction, upon which the majority heavily relies in its reasoning, reinforces this distinction when it states that "[w]ith the concurrence of the agency having custody thereof, any Federal property within the boundaries of the recreation area may be transferred... to the administrative jurisdiction of the Secretary for administration as a part of the recreation area." Id. § 460cc-1(b) (emphasis added). Under the majority's narrow equation of the term "recreation area" with those lands already under the Secretary's control, this provision becomes nonsensical.[1]
 
 
 51
 Thus, I cannot join my respected colleagues' assertion that Floyd Bennett Field is not "part" of Gateway, see Majority, supra, at 79. Instead, the Gateway Act expressly includes Floyd Bennett Field within the "recreation area" and hence within Gateway itself. "Since there is a presumption that a given term is used to mean the same thing throughout a statute," Brown v. Gardner, 513 U.S. 115, 118 (1994) (citing Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)), we are bound to read the term "recreation area" as used in §460cc-2(e) to include Floyd Bennett Field. Had Congress' purpose been to limit §460cc-2(e) to apply only to lands ceded to the administrative jurisdiction of the Secretary of the Interior, it could easily have done so explicitly, rather than writing the section to apply more generally to all lands within the "recreation area" as that term is broadly defined in §460cc(a).
 
 
 52
 The majority attempts to circumvent this plain language by pointing to the fact that the Gateway Act broadly carves out a number of "enclaves" within which other federal agencies may retain whatever administrative jurisdiction they previously enjoyed until such time as they voluntary cede control to the Secretary of the Interior. See 16 U.S.C. § 460cc-1(b). The mere fact that a statute establishes a general scheme does not preclude Congress from creating specific exceptions to that scheme, especially where the language used is unambiguous. See Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 440 (1992) (invoking "the canon that specific provisions qualify general ones") (citing Simpson v. United States, 435 U.S. 6, 15 (1978)). The plain language of §460cc-2(e) creates precisely such an exception by permitting the Secretary of Transportation to retain only joint jurisdiction with respect to air facilities, presumably to give the Secretary of the Interior veto power over the installation of air facilities that might detract from the natural beauty of Gateway.
 
 
 53
 This reading of §460cc-2(e) is underscored by comparison with the Golden Gate National Recreation Area Act, Pub. L. No. 92-589, 86 Stat. 1299 (codified at 16 U.S.C. §§ 460bb to 460bb-5) (Golden Gate Act). Unlike the Gateway Act, the Golden Gate Act generally requires the immediate transfer of all federal lands within the Golden Gate National Recreation Area to the administrative jurisdiction of the Secretary of the Interior. See 16 U.S.C. §460bb-2(a) (1994). Nonetheless, the Golden Gate Act also provides by way of exceptions that certain lands will remain within the charge of Departments other than the Department of the Interior. See, e.g., id. §460bb-2(c) (retaining jurisdiction under the Department of the Army); id. §460bb-2(f) (retaining jurisdiction under the Department of Defense); id. §460bb-2(h) (retaining jurisdiction under the Department of the Navy). Only when the lands in question are determined to be in excess of the assigned Department's needs will they be transferred to the administrative jurisdiction of the Secretary of the Interior in accordance with the Golden Gate Act.
 
 
 54
 In particular, the Golden Gate Act carves an exception for certain properties to remain under the jurisdiction of the Department in which the Coast Guard operates. See id. §460bb-2(g). This provision is particularly relevant to our analysis of the Gateway Act because it explicitly qualifies that should the Coast Guard transfer control to the Secretary of the Interior, then the two Departments would exercise joint jurisdiction:
 
 
 55
 Point Bonita, Point Diablo, Point Montara, and Lime Point shall remain under the jurisdiction of the Secretary of the Department in which the Coast Guard is operating. When this property is determined to be excess to the needs of the Coast Guard, it shall be transferred to the jurisdiction of the Secretary [of the Interior] for purposes of this subchapter. The Coast Guard may continue to maintain and operate existing navigational aids: Provided, That access to such navigational aids and the installation of necessary new navigational aids within the recreation area shall be undertaken in accordance with plans which are mutually acceptable to the Secretary [of the Interior] and the Secretary of the Department in which the Coast Guard is operating and which are consistent with both the purposes of this subchapter and the purpose of existing statutes dealing with establishment, maintenance, and operation of navigational aids.
 
 
 56
 Id. (second emphasis added).
 
 
 57
 Here, a number of points merit note. First, as evidenced throughout §460bb-2, Congress is fully capable of creating explicit exceptions to a general scheme for apportioning administrative jurisdiction among federal agencies. Had Congress intended to carve out an exception for Floyd Bennett Field from the "recreation area" governed by the Gateway Act, as the majority contends, it could have done so. Moreover, to the extent §460bb-2(g) creates an exception for joint jurisdiction, reading §460cc-2(e) of the Gateway Act to create a similar exception - albeit in mirror image to the Golden Gate Act - therefore produces no anomalies.
 
 
 58
 Second, much like §460cc-2(e) of the Gateway Act, §460bb 2(g) of the Golden Gate Act grants joint jurisdiction over the installation of new navigational aids "within the recreation area," which is once again defined by the opening sections of the statute to encompass all enumerated lands. See id. §§ 460bb, 460bb-1(a). Contrary to the majority's reasoning, see Majority, supra, at 16, §460bb-2(g) therefore requires joint approval of new navigational aids throughout the "recreation area" as that term is broadly defined by the statute. Accordingly, it may be inferred that Congress' use of similarly broad language in the Gateway Act was not the result of oversight, and that such language should be strictly followed by reading the term "recreation area" as used in §460cc-2(e) to encompass Floyd Bennett Field.[2]
 
 
 59
 Third, to the extent §460bb-2(g) of the Golden Gate Act imposes conditions whose timing hinges on the transfer of administrative jurisdiction, §460bb-2(g) does so explicitly. It provides that the Coast Guard "may continue to maintain and operate existing navigational aids" (emphasis added), following the transfer of jurisdiction from the Coast Guard to the Secretary of the Interior. If §460cc-2(e) of the Gateway Act were designed to apply only following such a transfer, Congress presumably would have used similarly explicit temporal language to achieve that result.[3]
 
 
 60
 Our decision in Natural Resources Defense Council, Inc. v. Marsh, 836 F.2d 87 (2d Cir. 1987), does not reach a contrary conclusion. The majority cites Marsh for the proposition that the Gateway Act "imposes no limitations on the Department of Defense's intervening use" of Gateway lands prior to the transfer of jurisdiction of those lands to the Secretary of the Interior, see id. at 90, notwithstanding language in §460cc-2(d) granting joint jurisdiction to the Secretaries of the Army and the Interior in a manner analogous to §460cc-2(e).
 
 
 61
 Marsh, however, presented the limited question of whether the language in §460cc-1(b), which permits the transfer of control to the Secretary of the Interior, prohibited the Secretary of the Army from transferring control of certain Gateway lands to another federal department not mentioned in §460cc-1(b), namely, the Navy. See id. at 88. Because §460cc-2(d) addresses only "water resource developments" by the Army, and not transfers of administrative jurisdiction, that provision was simply irrelevant to the Marsh decision (which neither discussed nor even cited §460cc-2(d)). Accordingly, the statement in Marsh about "intervening use" of Gateway lands was not a holding with respect to actions other than transfers of jurisdiction between federal departments as governed by §460cc-1(b).
 
 
 62
 In sum, §460cc-2(e) of the Gateway Act imposes a blanket restriction on the authority of the Secretary of Transportation without reference to any transfer of jurisdiction to the Secretary of the Interior. Because the language of the statute is unambiguous, recourse to the legislative history is unnecessary. See Desiderio v. National Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 204 (2d Cir. 1999) (citing Ex Parte Collett, 337 U.S. 55, 61 (1949)).
 
 
 63
 Even were such recourse appropriate, the legislative history is equivocal as to the temporal effect of §460cc-2(e), since, as discussed below, the history suggests that one purpose of the provision was to put an immediate stop to then-pending proposals to use Floyd Bennett Field as a general aviation field in service to other airports. Because the legislative history is conflicted on this point, the majority's reliance on isolated statements is misplaced. See Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment).
 
 II Merits of Petitioners' Claim
 
 64
 Consequently, I would conclude that 16 U.S.C. § 460cc-2(e) applies to the installation of the Radar Tower at Floyd Bennett Field and would therefore reach the merits of petitioners' claim that such installation is prohibited by the section's proviso against "the expansion of... air facilities at Floyd Bennett Field." Because the majority does not reach this claim, I address only a few key points.
 
 
 65
 First, the term "air facilities," used in the proviso of §460cc-2(e), appears nowhere else in the U.S. Code. Yet, a federal statute does define the similar term "air navigation facility" to mean "a facility used... in aid of air navigation, including... apparatus or equipment for distributing weather information." 49 U.S.C. § 40102(a)(4) (1994). Although the two terms are not identical, they are sufficiently similar that I would read "air facilities" to encompass the arguably narrower category of "air navigation facilities" and thus to embrace the proposed Radar Tower at Floyd Bennett Field.
 
 
 66
 The government contests this interpretation, contending that the term "air facilities" "generally refers not to a particular aviation-related structure, but to the entire collection of buildings, runways, and other support devices at an airfield." As a result, the government maintains, the proviso in 16 U.S.C. §460cc-2(e) bars only the expansion of the military airfields already in existence at Floyd Bennett Field and thus poses no obstacle to the installation of a single weather tower or other isolated structure unrelated to those existing airfields.
 
 
 67
 Even assuming arguendo that the government's strained reading of the term "air facilities" is reasonable, its argument still founders. To begin with, the proposed Radar Tower is plainly an expansion of the collection of devices that support John F. Kennedy International (JFK) and LaGuardia Airports. Although the government would presumably retort that these airports exist elsewhere and therefore are not "at" Floyd Bennett Field, this is a distinction without a difference.
 
 
 68
 Specifically, the legislative history of the Gateway Act reveals that Congress considered alternative proposals to develop Floyd Bennett Field as either a recreational area within Gateway, a housing community, or a general aviation field. See, e.g., Gateway Area Proposals: Hearings on H.R. 1370, H.R. 1121, and Related Bills Before the Subcomm. on Nat'l Parks and Rec. of the House Comm. on Interior and Insular Affairs, 92d Cong. 287 (1971) (statement of Rep. Roy A. Taylor, Chairman, Comm. on National Parks and Recreation). Under the third proposal, new installations at Floyd Bennett Field would have been undertaken to divert general aviation traffic from JFK and LaGuardia Airports and hence reduce air traffic congestion at those airports as part of an "integrated airport plan" for the New York City metropolitan area. Id. at 73, 221, 224 (statement of Rep. Frank J. Brasco, for the district including Floyd Bennett Field); see id. at 234-47 (statement of John V. Lindsay, Mayor of New York City).
 
 
 69
 But by including Floyd Bennett Field within the recreation area, Congress opted instead for the recreational proposal and accordingly enacted the current proviso barring "the expansion of... air facilities at Floyd Bennett Field." As a consequence, the modifying phrase "at Floyd Bennett Field" must be read as referring not to the location of the airfield serviced by a particular expansion - since that would permit the very result the statute was designed to avoid - but instead to the location of the new installations. Logically, therefore, the proviso plainly prohibits installation of the Radar Tower at Floyd Bennett Field.
 
 
 70
 Finally, the government asserts it would be absurd to read the proviso as prohibiting installation of the Radar Tower at Floyd Bennett Field, but not at any other location within Gateway, since Floyd Bennett Field is already more developed than other portions of Gateway, both for aviation purposes and otherwise. As discussed above, however, Congress enacted the proviso in the face of a specific proposal to expand air facilities at Floyd Bennett Field, and it was entirely logical to tailor the proviso to that particular proposal.
 
 
 71
 Moreover, the legislative history is replete with references to the recreational potential of Floyd Bennett Field. See, e.g., Gateway Nat'l Recreation Area: Hearings on S. 1193 and S. 1852 Before the Subcomm. on Parks and Rec. of the Senate Comm. on Interior and Insular Affairs, 92d Cong. 44, 47-48 (1971) (statement of Mr. Hartzog, Director, National Park Service); S. Rep. No. 92-345, at 4-5 (1971); H.R. Rep. No. 92-1392 (1972), reprinted in 1972 U.S.C.C.A.N. 4882, 4885; 118 Cong. Rec. 32,133, 32,136, 32,137-38, 32,152 (1972). Hence, it was far from absurd for Congress to seek to preserve those positive attributes by generally limiting development at the Field.
 
 CONCLUSION
 
 72
 For the reasons set forth above, I would grant the petition for review of the FAA's March 29, 1999 order authorizing the installation of the Radar Tower at Floyd Bennett Field. Accordingly, I concur with my colleagues in denying the FAA's motion for reconsideration, since the agreement between the Departments of the Interior and of Transportation would not affect my conclusion that the proviso in §460cc-2(e) bars the installation of the Radar Tower at Floyd Bennett Field.
 
 
 
 NOTES:
 
 
 [1]
 In response, the majority proposes a creative but counter-intuitive distinction between the "recreation area" and the "boundaries of the recreation area" as those phrases are used in § 460cc-1(b). The majority asserts that the "recreation area" includes only those lands over which the Secretary exercises jurisdiction, but that the "boundaries of the recreation area" include all lands listed in § 460cc, regardless of jurisdiction. See Majority, supra, at 79 n.5. But if this distinction was intended, one would expect the Gateway Act to use those terms consistently. Instead, § 460cc-1(b) recognizes that the Secretary has jurisdiction only over "part[s] of the recreation area" (emphasis added) and not necessarily the entire "recreation area." More importantly, the statute's definitional section uses these terms interchangeably. Section 460cc(a), entitled "Composition and boundaries," states that "[t]he recreation area shall comprise the following lands" depicted on the "Boundary Map," "including... Floyd Bennett Field." Section 460cc(b), entitled "Boundary revisions," allows for "minor revisions of the boundaries of the recreation area when necessary by publication of a revised [map] or other boundary description." Because § 460cc(a) and § 460cc(b) use these terms interchangeably, and explicitly include Floyd Bennett Field within the "recreation area," the majority's distinction I believe is untenable.
 
 
 [2]
 In response, the majority continues to rely on the mistaken premise that the "recreation area" includes only those lands transferred to the jurisdiction of the Secretary of the Interior, rather than all of those lands listed in the statutes as "compris[ing]" the "recreation area." See Majority, supra, at 81 n.6. In the Golden Gate Act, these alternate definitions tend to merge, since § 460bb-2(a) provides for the automatic transfer of all listed lands to the Secretary. In the Gateway Act these definitions produce different results, since § 460cc-1(b) provides for voluntary transfers. The key point is that both statutes define the "recreation area" broadly to comprise all of the listed lands, and both statutes' provisions for joint jurisdiction adhere to this broad definition of "recreation area."
 
 
 [3]
 In response, the majority contends that no temporal language is necessary in § 460cc-2(e) because that section contains no reference to the transfer of lands. See Majority, supra, at 18 n.6. But it is precisely because the section speaks in unqualified terms and contains no reference to the transfer permitted by § 460cc-1(b) that I would read it to apply at all times, regardless of whether a transfer has taken place. The majority's contrary view that § 460cc-2(e) applies only post-transfer hinges entirely on its cramped reading of the term "recreation area," which I reject for the reasons discussed above.