In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1750

IN RE:

MOTOROLA SECURITIES LITIGATION

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 00287—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED OCTOBER 5, 2009—DECIDED MAY 4, 2011

Before EVANS and SYKES, *Circuit Judges*, and SIMON, *District Judge.**

SYKES, *Circuit Judge*. In 2003 purchasers of Motorola, Inc., common stock brought a class-action lawsuit against Motorola and its then-principal officers alleging violations of federal securities laws. Class members included investors who purchased publicly traded Motorola common stock during the class period. Excepted from the class was any purchaser who was also an affiliate of Motorola.

* The Honorable Philip P. Simon, United States District Judge for the Northern District of Indiana, sitting by designation.

The events underlying the securities-fraud case spawned parallel class-action litigation filed by current and former Motorola employees under the Employee Retirement Income Security Act ("ERISA"). *See Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011). The cases were eventually assigned to the same district judge, and the securities-fraud action later settled for $190,000,000. Before the settlement proceeds were distributed, however, the Motorola 401(k) Profit-Sharing Plan ("the Plan") submitted a claim to share in the settlement. The Plan is a defined-contribution retirement plan, and its participants are current and former Motorola employees who established individual retirement accounts with the Plan. During the class period, many Plan participants acquired beneficial ownership of Motorola common stock by purchasing units of the Motorola Stock Fund, one of a limited number of investment options offered by the Plan Administrator. The Plan requested a share of the settlement proceeds to distribute among its participants who, as beneficial owners of Motorola common stock, were harmed by Motorola's allegedly unlawful conduct. The participants were also the plaintiffs in the related ERISA class-action litigation. *Id.* at 557-58.

The district court denied the Plan's claim to a share of the settlement. The court offered two reasons for its decision. First, the court noted that the class definition was limited to persons who purchased publicly traded Motorola common stock. Because the Plan's participants purchased units of the Motorola Stock Fund, not Motorola common stock, the court held that the Plan was not a member of the class. Alternatively, the court relied on

the exclusion in the class definition for any "affiliate" of Motorola. The court held that the Plan was an affiliate of Motorola and therefore was specifically excluded from the class. The Plan appealed.

We affirm, although on somewhat different reasoning. We disagree that the Plan is excluded from the class because the participants did not themselves purchase Motorola common stock. It is true that the Plan's participants purchased units of the Motorola Stock Fund, not Motorola common stock. But the claim was filed by the Plan, and it is undisputed that the Plan regularly purchased publicly traded Motorola common stock on the open market.

We agree, however, that the Plan is an affiliate of Motorola and on this basis is excluded from the class, although we arrive at this conclusion by a slightly different analysis. The district court applied the ordinary meaning of the term "affiliate," but we think the term must be understood in light of the specialized context in which it is used here. This is a securities-fraud case, and under federal securities law, an "affiliate" is defined by reference to control; one who controls, is controlled by, or is under common control with an issuer of a security is an affiliate. Motorola appoints the Plan's administrator—the Motorola 401(k) Profit-Sharing Committee—and the members of this Committee serve at the pleasure of Motorola's Board of Directors. This structural organizational control is sufficient to render the Plan an affiliate of Motorola. Accordingly, the Plan is excluded from the class definition, and the district court

properly denied its claim to a share of the settlement proceeds.

## I. Background

### A. The Motorola 401(k) Profit-Sharing Plan and the Motorola Stock Fund

The Plan is a participant-directed, defined-contribution retirement plan established for the benefit of current and former Motorola employees and administered pursuant to Section 404(c) of ERISA. *See* 29 U.S.C. § 1104. The Motorola 401(k) Profit-Sharing Committee is the Plan Administrator. Members of the Profit-Sharing Committee are appointed by Motorola's Board of Directors, and the Board retains the power to remove Committee members at any time and without cause. The Plan's charter states that the Profit-Sharing Committee is charged with the "authority and discretion to control and manage the operation and administration of the Plan." The Committee may delegate its operating authority, and it has done so by appointing a Trustee to manage the Plan's day-to-day operations.

The Plan is structured as follows: Plan assets are held in the Motorola Profit-Sharing and Investment Trust ("the Trust"), which is managed by the Trustee. Plan participants defer wages from their paychecks into the Trust and may choose to invest their contributions among several preselected investment funds offered by the Committee. Prior to July 1, 2000, participants could choose among four investment options; after that date

participants had nine options. At all pertinent times, one available investment option was the Motorola Stock Fund. The Motorola Stock Fund is a unitized investment vehicle that allows Plan participants to acquire beneficial ownership of Motorola common stock by purchasing units of the Fund. The Fund's assets consist almost entirely of Motorola common stock (about 99%), along with a nominal amount of cash (about 1%). When a participant purchases units of the Motorola Stock Fund, he acquires a pro rata interest in the Motorola common stock held by the Fund. The Trustee, not the participants, holds title to the Motorola common stock in the Fund. As participants buy or sell Fund units, the Trustee reallocates the Motorola common stock to the participants' accounts in amounts corresponding to each participant's unit ownership interest. If there is not enough Motorola common stock in the Fund to satisfy all of the participants' purchase orders for units in the Fund, the Trustee purchases additional stock on the open market and allocates it accordingly.

The stock in the Motorola Stock Fund is voted by the Trustee in accordance with instructions from the participants. As to shares for which no participant instructions are received, the Trustee votes those shares "proportionately," in the same manner as the shares for which he has received voting instructions. The value of a participant's interest in the Motorola Stock Fund fluctuates as the market price for Motorola common stock changes.

**B. The Motorola Litigation**

In 2003 the State of New Jersey, Department of Treasury, Division of Investment, initiated a securities-fraud class action against Motorola and its then-principal officers, Christopher Galvin (Chairman and Chief Executive Officer), Carl Koenemann (Chief Financial Officer), and Robert Growney (Chief Operating Officer). The factual basis for this litigation is described in more detail in an opinion recently issued by a different panel of this court in the related ERISA class-action litigation. *See Howell*, 633 F.3d at 555-56. Briefly, New Jersey alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, claiming that from February 3, 2000, to May 14, 2001, Motorola artificially inflated the prices of its securities, including Motorola common stock, by making materially false and misleading statements regarding a deal with Telsim, a Turkish wireless provider. New Jersey alleged that Motorola issued press releases claiming that the Telsim transaction could yield billions of dollars but never disclosed information about certain high-risk loans that were part of the deal. *Id.*

The district court certified the securities suit for class treatment and defined the class as follows:

> [A]ll persons who purchased *publicly traded* Motorola, Inc. common stock or registered debt securities during the period from February 3, 2000 through May 14, 2001 . . . and who allegedly were damaged thereby. Excluded from the Class are the Defendants herein, members of the Individual Defendants' im-

mediate families, any subsidiary, *affiliate*, or control person of any such person or entity, the officers of Motorola and the legal representatives, heirs, successors or assigns of any such excluded party.

(Emphasis added.) This class definition was reproduced in several subsequent court documents, including the notice alerting putative class members to the litigation.

The parties eventually settled the securities action for $190,000,000, and the terms of the settlement agreement were memorialized in a Stipulation of Settlement. The Stipulation incorporated by reference the class definition as it appeared in prior court orders and in the class notice. The district court approved the Stipulation and designated a claims administrator to oversee disbursement of the settlement proceeds, subject to the district court's supervision.

Shortly thereafter, the Plan filed a claim with the claims administrator seeking a share of the settlement proceeds. The Plan asserted that during the class period, 76,954 Plan participants acquired beneficial ownership of 21,113,303 shares of Motorola common stock via their purchases of units in the Motorola Stock Fund and were therefore entitled to a portion of the settlement. New Jersey recommended that the administrator deny the claim because the Plan was an affiliate of Motorola and therefore was excluded from the class. Following New Jersey's advice, the administrator denied the Plan's claim. New Jersey subsequently moved the court to distribute the proceeds of the settlement to approved class members.

The Plan promptly objected to New Jersey's distribution motion and asked the district court to review the administrator's decision disallowing its claim. The district court reaffirmed the administrator's decision and overruled the Plan's objection to New Jersey's motion for distribution. The court offered two independent reasons for rejecting the Plan's claim. First, the court determined that the Plan participants did not purchase Motorola common stock through open-market transactions and therefore were not purchasers of "publicly traded Motorola, Inc. common stock" as required by the class definition. Second, the court determined that the Plan was an "affiliate" of Motorola. The Plan then formally moved to intervene pursuant to Federal Rule of Civil Procedure 24 for purpose of taking this appeal. The district court granted the motion and ordered a distribution of the settlement funds, but held back an amount sufficient to satisfy the Plan's claims pending resolution of the appeal.

As we have noted, the Plan's participants also filed an ERISA class action (two cases, actually) against Motorola, some of its officers and directors, and the Profit-Sharing Committee. *See Howell*, 633 F.3d at 557-58. They alleged that the defendants breached their fiduciary duties under ERISA by continuing to offer the Motorola Stock Fund as an investment option when they knew about the problems associated with the Telsim deal and the effect the high-risk loans would have on the value of Motorola common stock. *Id*. at 555-56. The cases were assigned to the same district judge who was presiding over the securities-fraud class action. The judge eventu-

ally granted summary judgment for the defendants, a decision recently affirmed by another panel of this court. *Id.* at 573. In that appeal there were some threshold questions about whether the defendants were ERISA fiduciaries; on most of these questions, the *Howell* panel assumed for the sake of argument that they were. *Id.* at 562-65. This part of *Howell* has some relevance here, though not as much as the Plan contends. The court in *Howell* went on to conclude that the record was insufficient to raise a material issue for trial regarding whether ERISA duties had been breached. *Id.* at 573.

## II.  Discussion

At the outset the parties dispute the standard of review. In rejecting the Plan's claim, the district court issued two separate holdings: It held that the Plan was excluded from the class because (1) the participants did not purchase publicly traded Motorola common stock, and (2) the Plan was a Motorola affiliate. New Jersey contends these are factual findings that should be reviewed under a clearly erroneous standard. *See, e.g., Contempo Design, Inc. v. Chi. & Ne. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 544 (7th Cir. 2000) (en banc) (findings of facts are reviewed for clear error). The Plan contends they are legal conclusions because the court engaged in an interpretation of the class definition in the Stipulation of Settlement. Both sides are partly right. The district court's decision was based in part on its interpretation of the class definition—in particular, the meaning of the term "affiliate" and the proper understanding of the

"publicly traded" requirement. The interpretation of a class definition is a question of law that we review de novo. *See Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 272 (7th Cir. 1998). Once the meaning of these terms is settled, we defer to the district court's factual findings unless they are clearly erroneous. *See Contempo Design*, 226 F.3d at 544.

The district court first determined that the Plan was not a member of the class because the participants did not purchase publicly traded Motorola common stock, as required by the class definition. In this part of its order, the court focused on the actions of the Plan's participants and not of the Plan, noting later, however, that "[i]t is the Plan, not the individual participants, who filed a claim for recovery against the settlement fund." This mixed approach inadvertently introduced some confusion into the analysis. The Plan is the claimant here. That the individual participants did not purchase publicly traded Motorola stock does not take the Plan outside the class definition if the Plan itself purchased the stock. And the record is clear that the Plan regularly purchased publicly traded Motorola common stock and is not categorically excluded from the class on this basis.

More specifically, the Plan acts through its administrator, the Profit-Sharing Committee, 29 U.S.C. § 1102(a)(1) (ERISA fiduciaries have "authority to control and manage the operation and administration of the plan"), and the Committee delegated the operating management of the Plan's assets to the Trustee, *id.* § 1103(a) (requiring ERISA fiduciaries to hold plan assets in trust). Accord-

ingly, we attribute the actions of the Trustee to the Plan. It is undisputed that the Trustee periodically purchased Motorola common stock on the open market to ensure that the Motorola Stock Fund held a sufficient quantity of Motorola stock to account for the participants' unit transactions in the Fund. At oral argument New Jersey's counsel conceded this point:

> Counsel:  And as Your Honors have, I think, pointed out, there is a great deal of evidence in support of the fact that it is the Plan that is the actor that is at issue here. The Plan filed the claim, it signed the claim, and the claim never purported on its face to be filed on behalf of the participants.
>
> Q:  That defeats your argument under the publicly traded part of the definition.
>
> [Crosstalk] . . . .
>
> Q:  But if the Plan is the claimant here, the Plan purchased publicly traded shares of Motorola stock.
>
> Counsel:  I do not contest that the Plan goes into the market and purchases common stock.
>
> Q:  So you're conceding that?
>
> Counsel:  Yes.

This concession was prudent in light of the record.

Thus, the primary question on appeal is whether the Plan is an affiliate of Motorola, and this in turn depends on the meaning of "affiliate" as that term is used in the

class definition. "Affiliate" has both a plain meaning in ordinary usage and a more specialized definition in federal securities law. The district court opted for an ordinary-meaning definition of "affiliate," using the Sixth Edition of *Black's Law Dictionary*, which defines "affiliate" as "a condition of being united; being in close connection, allied, associated, or attached as a member or branch." BLACK'S LAW DICTIONARY 58 (6th ed. 1990). The court noted the "close connection" between Motorola and the Plan: The Plan's administrators were either Motorola directors or appointed by Motorola directors, and for a period of time, both Motorola and the Plan were represented by the same attorneys. The court concluded as follows: "Given this substantial overlap in personnel and duties between the Plan and the directors, overlap so substantial that they shared the same lawyers, the court has no difficulty concluding that the Plan is so 'allied, associated, or attached' to Motorola as to be considered an affiliate."

The Plan argues that the district court should have read the term "affiliate" according to its more specialized meaning under federal securities law. We agree. The term is used in the class definition, and as a general rule, a class definition is interpreted according to the substantive law that provides the basis for the class action. *See In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 49 F.3d 541, 543 (9th Cir. 1995). This is a securities-fraud action, and as such, federal securities law should inform the meaning of the term "affiliate" as it appears in the class definition.

Before proceeding further down this analytical path, we pause to address one potential complication in the analysis. The class definition, of course, originally appeared in the district court's class-certification order, which was later incorporated by reference into the Stipulation of Settlement. A settlement agreement is a contract, and contracts are interpreted according to the law of the jurisdiction in which the contract was created. *See Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008). That means Illinois law applies. This creates a potential interpretive dilemma: It is possible for the class definition to have one meaning under federal securities law and another meaning under Illinois law. This might occur, for example, if Illinois rules of contract interpretation required us to use the ordinary meaning of the term "affiliate" rather than its more particularized meaning under federal securities law. *See generally Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1215 (Ill. 1993) (discussing that as a general principle of Illinois law, an undefined contractual term is normally afforded its "plain, ordinary, and popular meaning" as derived from the dictionary definition); *Frederick v. Prof'l Truck Driver Training Sch., Inc.*, 765 N.E.2d 1143, 1152 (Ill. App. Ct. 2002) ("Unless the agreement unequivocally specifies special meanings, the court must interpret the words of the contract with their common and generally accepted meanings." (quotation marks omitted)); *but see* RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b) (2010) ("[T]echnical terms and words of art are given their technical meaning when used in a transaction within their technical field.").

This difficulty does not materialize here, for a couple of reasons. First, as we will explain, the result is the same under either definition. Second, a district court has the authority to modify a class definition at different stages in litigation, *see Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that judges and litigants regularly modify class definitions); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (courts have broad powers to modify class definitions); 32B AM. JUR. 2D *Federal Courts* § 1601 (2007), and the litigants are free to modify a class via a court-approved settlement agreement, *see, e.g.*, *Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467, 473-74 (E.D. Pa. 2007) (approving a settlement that modified the class definition); *see also* FED. R. CIV. P. 23(e) (class claims may be "settled, voluntarily dismissed, or compromised only with the court's approval"). But it does not follow that the class definition should be interpreted differently simply by virtue of having been incorporated into a settlement agreement enforceable as a contract under state law.

The Stipulation of Settlement was approved by the district court, and there is nothing to indicate that either the court or the parties intended it to modify the original class definition. Federal securities law governed the interpretation of the class definition at the time the class was certified, and unless modified, that meaning should prevail notwithstanding the incorporation of the class definition into a settlement agreement enforceable under Illinois contract law. Moreover, the choice-of-law clause in the Stipulation specifically reserves a role for federal law. It provides that the Stipulation "shall be

governed by the internal laws of the State of Illinois without regard to conflicts of laws, except to the extent that federal law . . . governs." Because the interpretation of a class definition ordinarily turns on the substantive law that governs the claim, federal securities law controls.

This brings us back to the question of the securities-law meaning of "affiliate," and we, like the district court, begin by consulting *Black's Law Dictionary*. But we refer to the ninth and most recent edition of *Black's,* which (unlike the earlier edition relied on by the district court) specifically includes a securities-law referent for the term "affiliate."[1] An "affiliate" is "[o]ne who controls, is controlled by, or is under common control with an issuer of a security." BLACK'S LAW DICTIONARY 67 (9th ed. 2009). On this more appropriate contextual definition, "control" by or in common with the issuer of a security is the key inquiry in assessing whether an entity is an affiliate.

This requirement is also reflected in the Securities and Exchange Commission rules promulgated under the

---

[1] The district court used the sixth edition of *Black's Law Dictionary*, which only contains a plain-language definition of the term "affiliate." However, the sixth edition also includes a definition for the related term "affiliate company," which is defined as a company "controlled" by another company. BLACK'S LAW DICTIONARY 58 (6th ed. 1990). This focus on control is important for purposes of securities law and is the dispositive inquiry in determining whether or not an entity is an affiliate.

authority of the Securities Act of 1933 and the Securities Exchange Act of 1934. For example, S.E.C. Rule 144 defines an "affiliate" of an issuer of securities as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). Similarly, Rule 12b-2 of S.E.C. Regulation 12B, which governs the registration and reporting of securities, defines an "affiliate" as a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." *Id.* § 240.12b-2.

"Control," in turn, is defined as the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee."[2] BLACK'S LAW DICTIONARY 378 (9th ed. 2009). This definition is almost identically replicated in Rule 12b-2, which defines "control" as "the possession, direct or indirect, of the power to direct or

---

[2] The quoted definition is for the noun form of "control." *Black's Law Dictionary* also contains a definition for the verb form that is substantially similar to the noun definition, but speaks in slightly more general language. Accordingly, "control" as a verb means: "1. To exercise power or influence over <the judge controlled the proceedings>. 2. To regulate or govern <by law, the budget office controls expenditures>. 3. To have a controlling interest in <the five shareholders controlled the company>." BLACK'S LAW DICTIONARY 378 (9th ed. 2009).

cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

On this securities-law understanding of "affiliate" and the concept of "control," Motorola, acting through its Board of Directors, controlled the Profit-Sharing Committee, the designated Plan Administrator. Because Motorola appointed and removed Committee members at will, it had structural organizational control over the management and policies of the Committee. But does this mean Motorola controlled the Plan? The answer depends on whether the Committee controlled the Plan; if it did, then because of Motorola's organizational control over the Committee, it also controlled the Plan.

Based on the Plan's structure and the requirements of ERISA, the Profit-Sharing Committee, as Plan Administrator, had managerial control over the policies and operation of the Plan. ERISA defines a fiduciary as one who either "exercises any authority or control respecting management or disposition of its assets," "renders investment advice for a fee," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). The *Howell* panel assumed for the sake of argument that the Committee was a fiduciary under ERISA. *Howell*, 633 F.3d at 564. ERISA fiduciaries are bound by a duty of "prudence" in designing investment plans and must give "appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment

course of action involved." 29 C.F.R. § 2550.404a-1(b)(1)(i); *see also* 29 U.S.C. § 1104(a)(1)(B) (defining the "prudent man standard of care" that must be exercised by ERISA fiduciaries); 29 C.F.R. § 2550.404a-1(b)(2) (explaining the requirements of "appropriate consideration").

But the question of control for purposes of being considered an "affiliate" does not require that the Committee had the kind or degree of control necessary to be deemed an ERISA fiduciary.[3] As the Plan Administrator,

---

[3] We note that the Plan participants, as the plaintiffs in *Howell,* necessarily took the position that the Committee is an ERISA fiduciary. *Howell v. Motorola, Inc.*, 633 F.3d 552, 562-64 (7th Cir. 2011). This is an implicit acknowledgment that the Committee exercised control over the Plan. The question whether Motorola controlled the Plan is somewhat more complicated. In a Rule 28(j) letter submitted after *Howell* was decided, the Plan asserted that the opinion in *Howell* requires that we conclude it did not. More specifically, the Plan cites this statement from *Howell*: "[T]here is no evidence in this record that Motorola did anything more than appoint Committee members to administer the Plan. No evidence suggests that the company exercised *de facto* control over Plan decisions through those Committee members." *Id.* at 562-63. The Plan argues that this passage compels the conclusion that Motorola's control over the Committee was insufficient to make the Plan an affiliate. We disagree. This part of *Howell* must be read in context of the question before the court in *Howell*. The question there was whether Motorola and the other defendants were ERISA fiduciaries for purposes of the

(continued...)

the Committee had general operational and administrative authority over the management of the Plan.[4] And since "control" includes the power to direct the management of an entity, *see* BLACK'S LAW DICTIONARY 378 (9th ed. 2009); 17 C.F.R. § 240.12b-2, we conclude that the Profit-Sharing Committee controlled the Plan.

The Plan sees things differently; it counters that even if the Committee exercised administrative control over plan assets, this administrative authority did not amount to control sufficient to make the Plan an affiliate

---

[3] (...continued)
participants' breach-of-fiduciary-duty claims. Here, in contrast, the Plan's status as an affiliate of Motorola turns on the question of control but does not require the degree of control necessary for fiduciary status; the "control" inquiries in the two contexts are not coextensive. In any event, *Howell* sidestepped the fiduciary-status question; as we have noted, the court assumed for the sake of argument that the defendants were fiduciaries and affirmed the summary judgment based on the lack of evidence of a breach of fiduciary duty. *Id.* at 563-64, 573.

[4] Article 7 of the Plan's governing document reiterates these responsibilities. The Plan states that "[t]he Profit Sharing Committee shall have authority and discretion to control and manage the operation and administration of the Plan" and then lists a nonexhaustive set of specific powers belonging to the Committee. Included are the powers to "construe and interpret the provisions of the Plan . . . [and] decide all questions arising thereunder," "prescribe procedures to be followed by Participants," and "rule on claims."

of Motorola. In particular the Plan contends that under federal securities law, "control" is the power to make normal investment decisions—such as the determination to acquire or dispose of securities—as well as the power to vote those securities. The Plan observes that the participants themselves controlled decisions to buy or sell units in the Motorola Stock Fund and retained voting control over the Motorola common stock allocated to their accounts. These key aspects of control, the Plan argues, suggest that the participants, and not the Profit-Sharing Committee, controlled the Plan.

We are not persuaded. Although it is true as a general matter that the Plan participants could direct their own investment decisions, their choices were severely circumscribed by Plan administrators; investment options were limited to the small number of funds selected by the Committee. Title to the stock was held by the Trustee, not the participants. The Trustee voted the stock according to instructions from the participants; if a participant did not provide the Trustee with voting instructions for the stock allocated to his account, the Plan's bylaws required the Trustee to vote those shares "proportionately[,] in the same manner as the Trustee votes shares as to which Trustee has received voting instructions." The Committee also had the discretion to limit, by percentage, the amount of money any one participant could contribute to any single investment fund and could restrict the frequency with which participants could reallocate their assets among the different funds.

In the end, the Profit-Sharing Committee had managerial and operational control over the Plan—albeit for the benefit of the participants—and because Motorola controlled the Committee through appointment and removal of its members, Motorola had structural organizational control over the Plan.[5] This degree of control is sufficient to make the Plan an affiliate of Motorola, and as an affiliate of Motorola, the Plan is specifically excluded from the class.

---

[5] The Plan cites several S.E.C. No-Action Letters interpreting Rule 144, 17 C.F.R. § 230.144, as applied to certain securities transactions by retirement plans. *See Conextant Sys., Inc.*, S.E.C. No-Action Letter, 1998 WL 823726, at *1, *9 (Nov. 27, 1998); *Rockwell Int'l Corp.*, S.E.C. No-Action Letter, 1996 WL 700547, at *1, *7 (Dec. 6, 1996); *Charles Schwab Corp.*, S.E.C. No-Action Letter, 1993 WL 214828, at *6 (made available June 10, 1993); *Terminal Data Corp.*, S.E.C. No-Action Letter, 1992 WL 217852, at *1-2 (Sept. 3, 1992). These letters reflect that for purposes of determining Rule 144 exemptions to registration requirements for transactions made by company retirement plans in the company's own stock, the S.E.C. has adopted a practice of examining whether the plan participants (not the retirement plan itself) are affiliates of the issuer of securities. *E.g., Rockwell Int'l Corp.*, 1996 WL 700547, at *1, *7. In other words, the S.E.C. "looks through" the retirement plan and considers the affiliate status of the participants to determine the applicability of an exemption from the registration requirements of the Securities Act of 1933. *See, e.g., id.* This "look through" policy has no application here; these S.E.C. No-Action Letters assume that a company retirement plan that trades in the company's stock is an affiliate of the company for general securities-law purposes.

Accordingly, for the foregoing reasons, the district court's order disallowing the Plan's claim to a share of the Motorola settlement proceeds is AFFIRMED.