14-4067-cv(L)

In re American International Group, Inc. Securities Litigation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: February 11, 2016                         Decided: September 20, 2016)

Docket Nos. 14-4067(L), 14-4603(con)

_____

SHARYN ROTHSTEIN, MARISA ROTHSTEIN, MOLLYE ROTHSTEIN, Objector, ALAN ROTHSTEIN, Objector, SAN FRANCISCO EMPLOYEES' RETIREMENT SYSTEM, ROBERT D. JAFFEE, as Trustee of the Robert D. Jaffee Revocable Trust, ROBERT D. AND PHYLLIS A. JAFFEE FAMILY FOUNDATION, ROBERT D. JAFFEE IRA ROLLOVER, ANNE E. FLYNN, on behalf of herself and all others similarly situated, MICHAEL CASSIDY, on behalf of himself and all others similarly situated, LISA M. CROUCH, on behalf of herself and all others similarly situated, ROBERT J. CASEY, II, on behalf of himself and all others similarly situated, EUGENE OLSON, JOSEPH SCUILLA, STEPHAN FRANK, on behalf of himself and all others similarly situated, JEROME NOLL, on behalf of himself and all others similarly situated, PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, MICHAEL FEDER, on behalf of himself and all others similarly situated,  PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO,

*Plaintiffs*,

OHIO POLICE AND FIRE PENSION FUND, STATE TEACHERS RETIREMENT SYSTEM OF OHIO, OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,

*Plaintiffs-Appellees,*

v.

AMERICAN INTERNATIONAL GROUP, INC. INCENTIVE SAVINGS PLAN, AMERICAN GENERAL AGENTS AND MANAGERS THRIFT PLAN, AMERICAN INTERNATIONAL GROUP, INC. RETIREMENT PLAN, AIG INSURANCE COMPANY-PUERTO RICO CAPITAL GROWTH PLAN, FKA CHARTIS INSURANCE CO. PUERTO RICO CAPITAL GROWTH PLAN, EVERCORE TRUST COMPANY, N.A., as independent fiduciary of the Plans,

*Appellants,*

AMERICAN INTERNATIONAL GROUP, INC., HOWARD SMITH, JOHN A. GRAF, JOHN HOULDSWORTH, WACHOVIA SECURITIES, LLC, RICHARD NAPIER, AXA FINANCIAL, INC., ELI BROAD, EVAN GREENBERG, UNION EXCESS REINSURANCE CO., RICHMOND INSURANCE CO., LTD., PRICEWATERHOUSECOOPERS LLP, MICHAEL L. MURPHY, MORGAN STANLEY, MERRILL LYNCH & CO., INC., JPMORGAN CHASE & CO., GOLDMAN SACHS & CO., CITIGROUP GLOBAL MARKET F/K/A SALOMON SMITH BARNEY, MICHAEL J. CASTELLI, C.V. STARR & CO., INC., MAURICE R. HANK GREENBERG, CORINNE P. GREENBERG, STARR INTERNATIONAL COMPANY, INC., GENERAL REINSURANCE CORPORATION, RONALD FERGUSON, PATRICIA R. MCCANN, DONALD P. KANAK, RICHARD A. GROSIAK, AXEL I. FREUDMANN, FRANK J. HOENEMEYER, CHRISTIAN MILTON, MARTIN J. SULLIVAN, THOMAS TIZZIO, HOWARD SMITH,

*Defendants.*[*]

_____

Before: POOLER and SACK, *Circuit Judges*, and FAILLA, *District Judge.*[1]

Appeal from a judgment of the United States District Court for the Southern District of New York (Batts, *J.*) denying Appellants' Motion to Direct the Settlement Claims Administrator to approve the Settlement Claims of Appellants (the "Motion to Direct"), as well as a related judgment denying Appellants' Motion to Intervene on timeliness grounds.

We first hold that Appellants have standing to appeal the district court's denial of the Motion to Direct. For this reason, we dismiss Appellants' appeal as to the denial of their Motion to Intervene as moot.

Second, we hold that because the Employee Retirement Income Security Act of 1974 ("ERISA") imposes important statutory limits on an employer's control over the management and policies of an employer-sponsored benefit plan, those plans do not fall within the ordinary meaning of the term "affiliate."

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

[1] The Hon. Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

Therefore, we vacate the district court's judgment denying Appellants' Motion to Direct and remand for further proceedings.

Vacated in part, dismissed as moot in part, and remanded.

_____

H. DOUGLAS HINSON, (Richard S. Siegel, Jonathan G. Rose, *on the brief*), Alston & Bird LLP, Washington, D.C. *for Appellants.*

LOUIS GOTTLIEB, (Thomas A. Dubbs, Nicole M. Zeiss, *on the brief*) Labaton Sucharow LLP, New York, NY *for Plaintiffs-Appellees.*

Lorie E. Almon and James Randolph Napoli, Seyfarth Shaw LLP, New York, NY *for amicus curiae American Benefits Council in support of Appellants.*

POOLER, *Circuit Judge*:

This case concerns a securities class action settlement agreement with American International Group, Inc. ("AIG"). Like many disputes over finite settlements, this case concerns who gets a "slice" of the settlement "pie." Appellants American International Group, Inc. Incentive Savings Plan (the "AIG ISP"), American General Agents' and Managers' Thrift Plan (the "Thrift Plan"), American International Group, Inc. Retirement Plan (the "Retirement Plan"), and AIG Insurance Company – Puerto Rico Capital Growth plan (the "Capital

Growth Plan") (collectively, the "Plans") are employee benefit plans sponsored by AIG or its affiliates under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. In this case, we consider whether the Plans are "affiliates" of AIG for the purposes of a class action settlement agreement. The district court below held that Appellants were "affiliates" of AIG and thus ineligible for their own slice of the settlement pie. We disagree. Because ERISA imposes important statutory limits on an employer's control over the management and policies of an employee benefit plan, those plans do not fall within the ordinary meaning of "affiliate." Thus, Appellants are entitled to their own slice of the settlement pie and Appellees will have to live with a somewhat smaller portion.

Accordingly, we vacate the district court's denial of the Plans' motion to direct.

## BACKGROUND

### I. Factual Background

#### A. The Settlement Agreements

Lead Plaintiffs reached several agreements with both AIG and PricewaterhouseCoopers ("PwC") to settle certain class action lawsuits alleging

violations of federal securities laws. Appellees resolved the class actions by way of four separate settlements: (1) the AIG Settlement; (2) the PwC Settlement; (3) the Gen Re Settlement; and (4) the Starr Settlement (the "Settlement Agreements"). The four settlements are substantially similar and all define the "Settlement Class" as follows:

> [The Settlement Class includes] all persons and entities who purchased or otherwise acquired *AIG Securities* during the period of time from October 28, 1999, through April 1, 2005, inclusive (the "Class Period"), as well as all persons and entities who held the common stock of HSB Group, Inc. ("HSB") at the time HSB was acquired by AIG in a stock for stock transaction, and all persons and entities who held the common stock of American General Corporation ("AGC") at the time AGC was acquired by AIG in a stock for stock transaction, and were damaged thereby (the "Settlement Class") . Excluded from the Settlement Class are (i) the Defendants, as named in the Consolidated Third Amended Class Action Complaint, dated December 15, 2006 (the "Complaint") in this Action; (ii) the immediate families of the Individual Defendants, as named in the Complaint; (*iii) any parent, subsidiary, affiliate, officer, or director of AIG*; (iv) persons who made requests for exclusion from the Settlement Class in the manner and within the time period provided by Section IV of the Agreement and/or by order of the Court and did not thereafter rescind such requests, such excluded persons being listed on Exhibit A hereto; (v) any entity in which any excluded person has a controlling interest; and (vi) the legal representatives, heirs, successors and assigns of any excluded person.

Special App'x at 6 (emphasis added); *see also, e.g.*, App'x at 1034-35. Both Appellants and Appellees agree that the term "affiliate" is not defined in the Settlement Agreements. *See* Special App'x at 7. "AIG Securities" is defined in the agreement as

> any and all *publicly-traded* securities issued by American International Group, Inc., whether debt or equity securities, including, without limitation, AIG common stock, the Zero Coupon Convertible Senior Debentures referenced in paragraph 189 of the Complaint, the 0.5% Cash Exchangeable Equity-Linked Senior Notes referenced in paragraph 193 of the Complaint, the 2.85% Medium-Term Notes, Series F referenced in paragraph 203 of the Complaint, the 2.875% Notes 144A securities referenced in paragraph 212 of the Complaint that were exchanged into registered like coupon bonds and the 4.25% Notes 144A securities referenced in paragraph 217 of the Complaint that were exchanged into registered like coupon bonds.

App'x at 2546 (emphasis added). Accordingly, to be a member of the Settlement Class, an investor, among other things, must have purchased *publicly-traded* AIG Securities and *must not be* an "affiliate" of AIG.

Claims were to be administered by Rust Consulting, Inc. ("Rust"). Rust's principal responsibility was to calculate the recognized loss for each claim based on the claimant's acquisition of AIG securities during the class period (the "Recognized Loss") and to distribute corresponding settlement funds, all according to formulas provided in the agreements.

7

After holding separate final approval hearings, the district court approved each of the settlements. On February 3, 2012, the District Court entered the Order and Final Judgment granting final approval to the AIG Settlement, which provided for the payment of $725 million.

**B. The Plans**

The Plans are of two different types. The Retirement Plan is a defined benefit plan, under which AIG guarantees each participating employee a set annual benefit upon retirement. AIG sets aside a pool of assets, including its own stock, to fund those benefits, and it assumes responsibility for providing additional funding if the pool proves inadequate for any reason — including market losses. The remainder of the Plans are defined contribution plans (the "Defined Contribution Plans"), under which AIG guarantees a set payment into participating employees' accounts each year before retirement. Participants may choose to invest those payments in the market through several funds that hold securities on the employees' behalf, including one fund that holds AIG common stock. If employees make such investments, however, they — and not AIG — take the risk of market losses.

8

The parties have identified two distinct methods of tabulating how much AIG common stock the Defined Contribution Plans acquired during the class period: the "plan level" and the "participant level." Claims submitted at the plan level list the total number of AIG shares that the Defined Contribution Plans purchased on behalf of all participating individuals. Claims submitted at the participant level, in contrast, list the total number of AIG shares that participating employees elected to acquire by investing money in their accounts.

Claims made at the plan and participant levels can diverge significantly. When an employee elects to acquire a share of AIG stock through one of the Defined Contribution Plans, the plan will not necessarily purchase a share on the open market; it may instead transfer a share previously held on behalf of a different employee who has since elected to sell it, thereby avoiding certain transaction costs. In this way, the number of AIG shares that the Defined Contribution Plans purchased on the open market during the class period (the plan level calculation) could be lower than the number of shares participating employees elected to acquire (the participant level calculation).

By contrast, there is only one way to tabulate how much AIG common stock the Retirement Fund, which is a defined benefit plan, purchased during the

class period: the plan level. The Retirement Fund invests in AIG stock, among other securities, in the hope of earning income sufficient to pay its set obligations to participating employees. The fund never purchases AIG stock on behalf of particular employees, which renders a participant-level claim inapposite.

**C. Claims Administration**

**1.      PWC Settlement Submissions**

As institutional investors in AIG common stock during the class period, the Plans submitted claims for a share of the PwC settlement. On January 23, 2009, Vanguard Fiduciary Trust Company ("Vanguard") submitted claims on behalf of the AIG Stock Fund – Master Trust, Fund #1837 (the "Master Trust") for, among other plans, the AIG ISP, the Capital Growth Plan, and the Thrift Plan. The claim was submitted at the plan-level. Rust estimated the Recognized Loss for these plans as approximately $25.6 million with respect to the PwC Settlement and $25.7 million with respect to the AIG settlement. On March 18, 2009, State Street Bank and Trust Company submitted an omnibus claim in the PwC Settlement that included the Retirement Plan, also at the plan-level. Rust estimated the Recognized Loss for the Retirement Plan as approximately $12.8

million with respect to the PwC Settlement and approximately $17.4 million with respect to the AIG Settlement.

On January 20, 2012, Mercer Trust Company ("Mercer"), which succeeded Vanguard as the Plans' trustee, submitted a claim form with a cover letter on behalf of AIG ISP and the Thrift Plan, along with several other employee benefit plans that merged into the AIG ISP during the class period, stating that "[t]he account transactional detail associated with this claim will be provided under separate cover and should be considered as an addenda to one or more previous submissions submitted by [Vanguard]" and that Mercer could not itself certify the accuracy or completeness of the data provided in the prior submissions by Vanguard. App'x at 2956.

Three days later, on January 23, 2012, Banco Popular of Puerto Rico ("Banco Popular"), submitted a claim on behalf of the Capital Growth Plan, also with a cover letter stating the transactional information was not available and would be provided under separate cover. According to Appellees, this additional information was not submitted to Rust until the end of 2012.

Appellants emphasize that at no point during "the next four-plus years, did Rust ever suggest to the Plans' fiduciaries that the Plans were ineligible to

11

participate in the Settlement Classes because they were 'affiliates' of AIG."

Appellants' Br. at 14; *see also* App'x at 2541.

### 2.    AIG Settlement Submissions

The Plans retained Appellant Evercore Trust Company, N.A. ("Evercore")

as their independent fiduciary to assess whether they should participate in the

AIG Settlement. On December 14, 2012, Evercore submitted a letter to Rust with

transactional data provided by AIG in support of the prior claims filed by Mercer

and Banco Popular. But unlike the transaction data originally provided by

Vanguard in 2009 in the PwC Settlement, the transaction data provided in 2012

by AIG "was not plan-level data but was participant-level data." Appellees' Br.

at 11; *see also* App'x at 2957. Appellants claim that the proof of claim form

approved by the Court for the AIG Settlement invited submissions that provided

supplemental data not submitted in connection with the PwC Settlement. For

this reason, Appellants claim that more detailed participant-level data was

appropriate, *i.e.* data accounting for the estimated losses by all of the participants

of the Defined Contribution Plans, based upon their transactions involving AIG

Stock rather than plan-level data which merely accounted for the purchases and

sales of AIG Stock by the Plans on the open market. Evercore requested that Rust

12

"issue the appropriate 'Distribution Amounts' in a lump sum to Mercer and Banco Popular respectively" and that "Mercer and Banco Popular w[ould] then allocate payments to the appropriate participant amounts." App'x at 2957. Appellees claim this "conversion" from plan-level claims to participant-level claims, "would have resulted in a substantially higher Recognized Loss." Appellees' Br. at 12.

But on January 11, 2013, Rust proposed accepting the participant-level data on behalf of the Defined Contribution Plans and using that data for the PwC Settlement as well. Appellants explain that the Plans did not object to Rust's decision to apply participant-level data "because the use of participant-level data shows the actual, individualized losses allegedly incurred by the Defined Contribution Plans' participants – just like all other AIG shareholders." Appellants' Br. at 16; *see also* App'x at 2996.

On February 22, 2013, approximately four years after the AIG ISP, the Capital Growth Plan, and the Thrift Plan submitted their claims for the PwC Settlement, Rust issued "Notices of Ineligibility," all virtually identical, stating that the Plans' claims were ineligible under both the PwC Settlement and the AIG Settlement. Rust based its decisions on its review of the participant-level

13

and plan-level data, the securities involved, and a consideration of the opinions in *In re Motorola Securities Litigation*, 644 F.3d 511 (7th Cir. 2011) ("*Motorola*") and *In re Marsh & McClennan Companies*, *Inc. Securities Litigation*, No. 04-CV-8144 (S.D.N.Y. June 1, 2011) ("*Marsh*").

Rust identified two independent grounds for ineligibility. First, it stated that each of the claims "submitted appear[ed] to be on behalf of an 'affiliate' of defendant AIG," which was impermissible under the Settlement Agreements. App'x at 2618, 2620, 2622, 2624, 2626, 2628. Although the Notices of Ineligibility did not elaborate on this assertion, it seems clear that Rust classified the Plans as affiliates because they were sponsored, under ERISA, by AIG or its affiliates. Both *Motorola* and *Marsh* had previously reached similar conclusions in analogous cases. *See Motorola*, 644 F.3d at 521 (holding that a defendant corporation's 401(k) plan was excluded from the class definition as an "affiliate"); *Marsh* at 2-3, App'x at 2633-34 (same).

Second, Rust stated that claims submitted at the participant level on behalf of the Defined Contribution Plans would be ineligible because they failed to

14

identify any purchases of publicly traded AIG Securities.[2] In Rust's view, although participating employees initially elected to acquire AIG stock under these plans, it was the plans themselves that actually purchased the stock in publicly traded form.

On March 19, 2013, Appellants' counsel sent a letter to Rust explaining why *Motorola* and *Marsh* "did not and should not control the Plans' status as members of the respective settlement classes," and argued the Plans are not "affiliates" of AIG, and thus requested that Rust reverse its decision as to the Plans' eligibility. Appellants' Br. at 17. Appellants state that to this day, Rust has not responded to this letter. Appellants claim that in lieu of responding to their request, Rust asked Appellants to provide: "(1) information regarding whether 'trust level' transactions were made on the 'open market' or were direct purchases from AIG; (2) the amount of each type of transaction; and (3) broker confirmations for all purchases and sales during the class period." Appellants' Br. at 18; *see also* App'x at 2659.

---

[2] Rust also stated that the Retirement Plan's claim had improperly been submitted at the participant level. As we have noted, however, the claim was in fact submitted (out of necessity) at the plan level.

## II.   Procedural History

On May 29, 2013, the Lead Plaintiffs filed their Motion for Approval of an Initial Distribution of Settlement Proceeds in Connection with the Settlements with PwC and AIG in the District Court for the Southern District of New York (Batts, *J.*). *See* App'x at 1889-1937. Appellants timely filed a Motion to Direct in the same court requesting that the district court direct Rust to approve the Plans' claims and distribute proceeds from the Settlements to the Plans. Appellees opposed the motion.

The district court issued a Memorandum and Order, denying the Appellants' Motion to Direct and approving the initial distribution of the PwC and AIG Settlements. *See* Special App'x at 1-19.

The Plans and Evercore then filed a motion to Intervene for Limited Purpose of Possible Appeal ("Motion to Intervene"), which Lead Plaintiffs opposed. The District Court entered an order denying the Motion to Intervene, finding it untimely. In the court's view, the Plans should have moved to intervene "at least as early as the filing of the Third Amended Complaint." App'x at 3146; Special App'x at 23.

Appellants timely filed notices of appeal from both the order on the Motion to Direct and the order on the Motion to Intervene. Appellants did not appeal the district court's orders authorizing the initial distribution of the settlements. Rust issued the initial distribution payments on November 18, 2014.

**DISCUSSION**

**I**

We "must address any jurisdictional standing question first, before deciding a case on the merits." *Friends of Gateway v. Slater*, 257 F.3d 74, 77-78 (2d Cir. 2001). Appellees contest Appellants' "standing"[3] to bring this appeal on two grounds: (1) the non-appealability provision of the Settlement Agreements expressly bars appeals beyond the level of the district court; and (2) because the district court held Appellants are not members of the Settlement Class, they are

---

[3] We note, as the Supreme Court did in *Devlin v. Scardeletti*, 536 U.S. 1, 6 (2002) that although both parties frame this issue "as one of standing[,] . . . this issue does not implicate the jurisdiction of the court under Article III of the Constitution." As the Plans are similarly situated to other class members, we would have little trouble finding that the Plans safely clear the constitutional and prudential hurdles of standing. Rather, what is truly at issue, is "whether [the Plans] should be considered '[parties]' for the purposes of appealing" the denial of the motion to direct. *Devlin*, 536 U.S. at 7.

17

non-parties that cannot bring an appeal. Appellants argue they are not bound by the non-appealability provision and that they are entitled to appeal despite their status as non-parties. In the alternative, Appellants urge us to reverse the district court's denial of their motion to intervene.

For the reasons that follow, we conclude that the non-appealability provision does not bar Appellants' appeal and that they may appeal the denial of the motion to direct as non-parties. Because we determine that Appellants may maintain this appeal without successfully intervening below, we dismiss as moot their appeal of the district court's denial of the motion to intervene.

**A**

The Settlement Agreements included a non-appealability provision barring appeals from the district court of "dispute[s] concerning a claim." App'x at 847. The provision, in relevant part, reads as follows:

> The validity of each Proof of Claim filed shall initially be determined by the Administrator in accordance with the Plan of Allocation approved by the Court. The Administrator shall promptly advise the claimant in writing if the Administrator determines to reject the claim. . . . *If a dispute concerning a claim cannot be otherwise resolved, Lead Counsel shall thereafter present the request for review to the [District] Court for summary resolution, without any right of appeal or review.*

App'x at 847 (AIG Settlement Agreement) (emphasis added); *see also* App'x at. 2556-57 (PwC Settlement Agreement). It is not uncommon for parties to include in a settlement agreement an "explicit agreement that the district court decision shall be final and that all rights of appeal are waived." 15A Charles Alan Wright et al., *Federal Practice and Procedure* § 3901 (2d ed. 2014). But we conclude that this provision does not bar Appellants' appeal.

As an initial matter, Appellees urge us to endorse a kind of Catch-22 theory of appellate jurisdiction. Appellees argue that the Plans are *not* members of the Settlement Class because they are "affiliates" of AIG. You would think, then, that Appellees would agree that the Plans are not bound by the Settlement Agreements, which were entered into between the Lead Plaintiffs, "on behalf of the *Settlement Class*," and AIG. App'x at 829 (emphasis added). Not so. Instead, even as they maintain that the Plans are not members of the Settlement Class, Appellees argue that the Plans are nonetheless bound by the Settlement Agreements' non-appealability provision. We decline Appellees' request to permit them to have their pie and eat it too.

At oral argument, Appellees suggested that the Plans are bound by the non-appealability provision because they are "claimants." But nothing in the

Settlement Agreements suggests that mere "claimants" are bound by the agreements. It is a "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment . . . in litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Because the Plans have not yet been held to be "members of the Settlement Class" they cannot be "bound by any orders or judgments entered in respect to the settlement." *Casey v. Citibank, N.A.*, No. 5:12-CV-820, at *5 (N.D.N.Y. Aug. 21, 2014).

**B**

As a general rule, only parties to a lawsuit, whether from the outset or through intervention, may appeal an adverse judgment. *Marino v. Ortiz*, 484 U.S. 301, 304 (1988). But we have recognized two exceptions to this rule: (1) "a nonparty may appeal a judgment by which it is bound," and (2) "a nonparty may appeal if it has an interest affected by the judgment." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 78 (2d Cir. 2006) (internal quotation marks omitted). Appellants invoke this second exception.

We have long allowed appeals by a nonparty "when the nonparty has an interest that is affected by the trial court's judgment." *Karaha Bodas Co. v.*

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 82 (2d Cir. 2002) (internal quotation marks omitted); *see also United States v. Int'l Bhd. of Teamsters*, 931 F.2d 177, 183-84 (2d Cir. 1991); *Hispanic Soc'y v. N.Y.C. Police Dep't*, 806 F.2d 1147, 1152 (2d Cir. 1986). And we "have not required that a nonparty *prove* that it has an interest affected by the judgment;" rather, "stating a plausible affected interest has been sufficient." *WorldCom*, 467 F.3d at 78 (2d Cir. 2006) (emphasis added).

"The question therefore is whether [Appellants] can identify an 'affected interest.'" *Kaplan v. Rand*, 192 F.3d 60, 67 (2d Cir. 1999). Appellees argue that permitting Appellants' appeal would grant "standing" to "virtually any third-party that filed a notice of appeal." Appellees Br. at 20. We disagree. We believe there are several reasons Appellants should be "considered a 'party' for the purpos[e] of appealing" the district court's denial of the motion to direct. *Devlin*, 536 U.S. at 7. First, the Plans had bona fide reasons to believe they were members of the Settlement Class. Second, the Plans reasonably relied on claims submitted to Rust and were given no indication that they may have been ineligible. Third, and most important, the Plans have a concrete and particularized interest clearly affected by the judgment of the district court: the exclusion of the Plans from the

Settlement Class deprives the Plans, their participants, and their beneficiaries of their recognized loss of either $81.5 million or $200.6 million, depending on whether it is calculated at the plan- or participant-level.

At this time, we need not decide whether *any* nonparty putative class member would be able to appeal a denial of a motion to direct without first successfully intervening. We "emphasize that our [holding] is heavily based on the unique . . . posture of this case," *In re Lawrence*, 293 F.3d 615, 625 (2d Cir. 2002), which demonstrates that the Plans clearly have a sufficient "interest that is affected by the trial court's judgment." *Pertamina*, 313 F.3d at 82.

**C**

Because we find that Appellants may appeal the denial of the motion to direct regardless of whether they successfully intervened, we dismiss as moot their appeal of the district court's denial of the motion to intervene. Nonetheless, although "[t]he timeliness requirement" of intervention "is flexible and the decision is one entrusted to the district judge's sound discretion, *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594-95 (2d Cir. 1986), we think it important to address the possible troubling consequences of the district court's holding that

22

the Plans should have moved to intervene "at least as early as the filing of the Third Amended Complaint." App'x at 3146; Special App'x at 23.

At the complaint stage, it is unlikely the Plans would have known of their interest in the district court litigation. *See Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) ("Among the most important factors in a timeliness decision is the length of time the applicant knew or should have known of its interest before making the motion."). The district court's suggestion that the Plans should have intervened at such an early stage could unduly encourage other putative nonnamed class members in future class actions to needlessly intervene, frustrating the purposes and goals of class action litigation. Fearful that the district court would find their motions to intervene untimely, virtually "all class members would be forced to intervene to preserve their claims, and one of the major goals of class action litigation—to simplify litigation involving a large number of class members with similar claims—would be defeated." *Devlin*, 536 U.S at 10. Unnecessary intervention by any putative class member with the *slightest* doubt that they might be excluded from the settlement class would only increase the "extraordinary amount of judicial and private resources . . . [of] massive class action litigation." *Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437,

23

1455 (E.D. Pa. 1995). Thus, we caution the district courts to be mindful when dismissing similar motions to intervene on timeliness grounds lest the courts invite needless litigation into their courtrooms.

## II

As a question of law, we review the district court's interpretation of the Settlement Agreements de novo. *Cirino v. City of N.Y.* (*In re World Trade Ctr. Disaster Site Litig.*), 754 F.3d 114, 121 (2d Cir. 2014). The district court denied the motion to direct on the ground that the Plans are excluded from the Settlement Class as "affiliates" of AIG. In reaching this conclusion, however, the district court did not consider the statutory limitations imposed on a sponsor's control over an employee benefit plan under ERISA. Because those limitations are substantial, the Plans cannot be considered "affiliates" under any ordinary or specialized understanding of that term, and certainly not when viewed in the context of the Settlement Agreements.

### A

Like consent decrees, settlement agreements are "hybrid[s] in the sense that they are at once both contracts and orders; they are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.2d 1556, 1567-68 (2d

Cir. 1985) (citation omitted). As contracts, we interpret them in accordance with general principles of contract law. *See Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir. 2002). "When interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.,* 603 F.3d 169, 180 (2d Cir. 2010) (alterations and internal quotation marks omitted). Thus, if their terms are unambiguous, we must interpret the Settlement Agreements "within [their] four corners, and not by reference to what might satisfy the purposes of one of the parties to [them]." *Berger,* 771 F.2d. at 1568 (quoting *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971) (discussing consent decrees)); *see also Seabury Constr. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 68 (2d Cir. 2002) ("Where the contract is unambiguous, courts must effectuate its plain language.").

The Settlement Agreements exclude from the settlement class "any parent, subsidiary, *affiliate,* officer, or director of AIG." App'x at 1035 (emphasis added). The parties agree that the term "affiliate" is not defined in the Settlement Agreements. Like the district court, we begin by consulting *Black's Law Dictionary,* which defines an affiliate, in the context of securities, as "[o]ne who controls, is controlled by, or is under common control with an issuer of a

security."[4] *Affiliate*, *Black's Law Dictionary* (10th ed. 2014). Thus, whether the Plans are "affiliates" of AIG turns on whether they are controlled by, or are under common control with, AIG.

We note that we would reach the same conclusion if we looked to the definition of "affiliate" in the rules promulgated by the Securities and Exchange Commission under the Securities Act of 1933 and the Securities Exchange Act of 1934. SEC Rule 144 defines an "affiliate" of an issuer of securities as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). And Rule 12b–2 of SEC Regulation 12B defines an "affiliate" as a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." *Id.* § 240.12b–2.

"Control," in turn, is defined by *Black's Law Dictionary* as the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the

---

[4] We believe this definition of affiliate is instructive here because the dispute and Settlement Agreements relate to an underlying securities class action. Moreover, we disagree with Appellants' views concerning the ambiguity of the term "affiliate" and the appropriateness of looking to securities law to define the term.

26

power or authority to manage, direct, or oversee." *Control, Black's Law Dictionary* (10th ed. 2014). This definition of "control" is virtually identical to the definition of control "provided in regulations promulgated under the 1933 and 1934 Acts." *Waldman v. Riedinger*, 423 F.3d 145, 151 (2d Cir. 2005). SEC Rule 405 of Regulation C defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2009) (quoting 17 C.F.R. § 230.405); *see also* 17 C.F.R. § 240.12b–2 (same).

Accordingly, whether the Plans are "affiliates" of AIG turns on whether AIG possesses the "direct or indirect . . . power to direct or cause the direction of the management and policies" of the Plans.

**B**

The district court concluded that AIG possessed the power to "direct or cause the direction of the management and policies" of the Plans, relying on several indicia of "control:" (1) "[t]he plans are each sponsored by either AIG itself or a company subsidiary[;]" (2) "the AIG Retirement Board, the Plans' administrator, was not only appointed by AIG, but its members were all AIG

27

employees, including officers and directors of the company[;]" and (3) "the company could disband the plans without reason." Special App'x at 10.

In reaching this conclusion, the district court relied, in part, on the Seventh Circuit's decision addressing an almost identical fact pattern concerning a securities settlement with Motorola. *See In re Motorola Sec. Litig.*, 644 F.3d 511 (7th Cir. 2011) ("*Motorola*"). The Seventh Circuit applied a similar definition of "affiliate:" "one who controls, is controlled by, or is under common control with an issuer of a security." *Id.* at 513. The *Motorola* panel noted that Motorola "appoint[ed] the Plan's administrator—the Motorola 401(k) Profit–Sharing Committee—and the members of this Committee serve[d] at the pleasure of Motorola's Board of Directors" and concluded that this kind of "'structural organizational control' [was] sufficient to make the Plan an affiliate of Motorola." *Id.* The panel reasoned that "[a]s the Plan Administrator, the Committee had general operational and administrative authority over the management of the Plan[,] [a]nd since 'control' includes the power to direct the management of an entity, we conclude that the Profit–Sharing Committee controlled the Plan." *Id.* at 520 (citations omitted).

We are, of course, not bound by a decision by a sister circuit, but we do not disagree with one lightly. Nonetheless, the *Motorola* panel, and the district court here, did not consider the role of ERISA in shaping the contours and limits on an employer's "control" over a sponsored plan. This inattention was understandable, inasmuch as the parties in that case failed to raise ERISA as an issue. *See generally In re Motorola Secs., Inc.*, No. 09-1750, 2009 WL 1557636 (7th Cir. May 14, 2009) (Brief of Intervenor-Appellant Motorola, Inc. 401(k) Profit-Sharing Plan). But even if *Motorola* can be read to go so far as to say all ERISA plans are all "affiliates" of their sponsors, we decline to follow it. Doing so would require us to ignore Congress's specific statutory limitations on an employer's control over a sponsored plan.

ERISA is structured to "insulate the trust from the employer's interest." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 333 (1981). The Department of Labor, the "agency charged with administering and enforcing Title I of ERISA," *Faber v. Metro Life Ins. Col,* 648 F.3d 98, 105 (2d Cir. 2011), has made clear that "[m]any of the provisions of ERISA are grounded on the concept that an employee benefit plan *must be independent of the employer that sponsors the plan.*" *Grindstaff v. Green*, No. 96-5628, 1996 WL 34386660 (6th Cir. Oct. 29, 1996) (Brief of Amicus Curiae,

Robert B. Reich, Secretary of the United States Department of Labor) (emphasis added)). For example, the plan's assets must be maintained in a trust, 29 U.S.C. § 1103(a), and "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

Thus, although the plans "are each sponsored by either AIG itself or a company subsidiary," Special App'x at 10, this is too slender a reed upon which to predicate a finding of control. ERISA is a "comprehensive and reticulated statute [for which] Congress made detailed findings which recited, in part, 'that the continued well-being and security of millions of employees and their dependents are directly affected by these plans.'" *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361-62 (1980) (footnote omitted) (quoting ERISA § 2(a), 29 U.S.C. § 1001(a)). Accordingly, ERISA is designed to delicately balance Congress's clear "attempt to promote employee ownership of employer stock," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014); *see also Gray v. Citigroup, Inc.* (*In re Citigroup ERISA Litig*)., 662 F.3d 128, 137 (2d Cir. 2011) (noting Congress's "goal of encouraging employee ownership of the company's

stock"), *abrogated on other grounds by Fifth Third Bancorp*, 134 S. Ct. at 2465, with a recognition that the interests of the employer and the interests of the plans may not be aligned. *Pegram v. Iterdich*, 530 U.S. 211, 255 (2000). In fact, ERISA *presumes* that the interests of the employer and the employer-sponsored plans are *adverse*. *See id.*; *see also Liss v. Smith*, 991 F. Supp. 278, 291 (S.D.N.Y. 1998) ("Employers are parties-in-interest [whose] interests are adverse to those of the plan." (citation omitted)); *Gruby v. Brady*, 838 F. Supp. 820, 833 (S.D.N.Y. 1993) ("Clearly, Fund employers are parties with interests adverse to those of plan Members. Indeed, the employers' interests lie in minimizing their obligations to the Fund, whereas the Fund's interest is in collecting all contributions owed."). To the extent sponsorship of an ERISA plan says anything about an employer's control over that plan, it is that any such control is specifically circumscribed to ensure the plan is managed "solely in the interest of the [plan's] participants and beneficiaries." 29 U.S.C. § 1104(a)(1). This is unlike your garden variety parent-affiliate relationship. For example, ordinarily, an affiliate's directors and officers can be removed "with or without cause, by the holders of a majority of the shares," including when the individual acts contrary to the interests of the parent. *See, e.g.*, Del. Code Ann. tit. 8, § 141(k). This kind of control is simply

impermissible under ERISA. *See, e.g.*, *Bennett v. Mfrs. & Traders*, No. 599-CV-827 HGM/GHL, 2005 WL 2896962, at *8 (N.D.N.Y. Nov. 2, 2005) ("By selecting and appointing the Plans' trustees in her own interest . . . Bennett failed to act solely in the interest of the Plans' participants and beneficiaries in violation of ERISA . . . .").

In light of ERISA's requirements, AIG's ability to appoint and remove members of the Plans' Retirement Board does not yield control over the "management and policies" of the Plans. If Board members had discretion to favor AIG to varying degrees in their management of the Plans, then AIG might be able to exert control both by appointing people particularly aligned with its interests and by using the threat of removal to ensure that such alignment persisted. But Board members have no such discretion. Appointees to the Retirement Board serve as fiduciaries to the Plans, their participants, and their beneficiaries, and ERISA subjects its fiduciaries to what have been called the "*highest duties known to law.*" Jayne Zanglein, et al., ERISA Litigation 1261 (5th ed. 2014) (emphasis added). Plan fiduciaries must act "solely in the interest of the [plan's] participants and beneficiaries." 29 U.S.C. § 1104(a)(1). "This statutory duty of loyalty has been described by this Court as requiring that a fiduciary act,

in Judge Friendly's felicitous phrase, with an 'eye single to the interests of the participants and beneficiaries.'" *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). Although AIG may select who serves as a member of the Retirement Board, it may not use that power to shape the Plans' management and policies.[5]

This conclusion holds even where AIG appoints its own officers and directors as members of the Retirement Board. ERISA "imposes a duty on the [fiduciaries] to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the *complete loyalty to participants* demanded of them as" fiduciaries of a plan. *Donovan*, 680 F.2d at 271 (emphasis added). ERISA expressly contemplates scenarios where a sponsor might appoint its own officers and directors to a plan's board. But these officers and directors, who are permitted to "wear different hats," must nonetheless "wear *only one at a time*, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225 (emphasis added). "[T]o prevent any

---

[5] The *Motorola* decision concluded, to the contrary, that "Motorola had structural organizational control over the Plan" that it sponsored because it controlled the "appointment and removal of [the plan's board's] members." *Motorola*, 644 F.3d at 521. In reaching that conclusion, the panel did not consider the critical significance of the fiduciary obligations imposed by ERISA.

possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'" *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329-30 (1981) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, *J.*)). "A fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *Id.* (quoting *Woods v. City Nat'l Bank & Tr. Co.*, 312 U.S. 262, 269 (1941)). Thus, although Appellees note that AIG Retirement Board members Axel Freudmann and Kathleen Shannon, defendants in the ERISA Action, "were also executive officers of AIG during the Class period in the Action," Appellees' Br. at 34 (citing App'x at 2887-88), that says nothing about whether AIG possesses the "direct or indirect . . . power to direct or cause the direction of the management and policies" of the Plans.

For similar reasons, AIG's authority to "disband the Plans without reason," Special App'x at 10, does not imply authority to direct management or policy decisions. Again, if the Board had discretion to favor AIG in its management of the Plans, AIG might be able to compel favorable treatment by threatening to disband the Plans if the Board did not cooperate. But ERISA's imposition of strict fiduciary duties blocks such corporate influence.

In adopting the rationale of the *Motorola* decision, which had also been adopted by at least one district court in this Circuit, the district court failed to consider Congress's clear directive to encourage participation in plans providing employee ownership of employer stock while ensuring that such plans are not managed in the interests of the sponsor, and in so doing erred. When examined through the intricate prism of ERISA's statutory goals and requirements, AIG's sponsorship of the plans, its appointment and removal power, and its discretionary disbanding power are all insufficient to demonstrate it possesses the power to direct the management and policies of the Plans. Thus, we conclude the district court erred in determining that the Plans are "affiliates" of AIG.[6]

---

[6] We do not decide today whether the courts owe deference (and if so, the appropriate degree of deference) to the findings of the Department of Labor ("DOL") that accompany the Prohibited Transaction Exemption 2003-39 and amendments thereto. We merely note that courts could consider the DOL's views as to ERISA's impact on the degree of control exerted by a plan sponsor on an employee benefit plan. In this instance, our ruling that the district court erred in determining that the Plans are "affiliates" of AIG is consistent with the DOL's belief that ERISA plan participants should not be disadvantaged when compared to other shareholders when settling securities litigations.

Although we are confident our conclusion is dictated by the text of the Settlement Agreement, we observe that a contrary result could not reflect the purpose of the exclusion of "affiliates" from the settlement class. We have recognized elsewhere that ordinarily the purpose of a settlement agreement's exclusion of "affiliates" is to "ensure that those who perpetrated, or otherwise profited from, the alleged [wrong] would not benefit from the settlement." *Waldman v. Riedinger*, 423 F.3d 145, 153 (2d Cir. 2005). In *Waldman*, we considered whether a trustee was an "affiliate" of a corporation and determined he was not "because he neither controlled nor was controlled by any of the defendants." *Id.* at 151. We also noted that "[r]ather than profiting from the alleged fraud, as an affiliate might have done, [the trustee] was *victimized* by it." *Id.* at 153(emphasis added). "For this reason, . . . we c[ould not] conclude that he was an affiliate." *Id.* The same is the case here; there is no dispute that the participants and beneficiaries of the Plans are not those that perpetrated the alleged securities violations that gave rise to this class action.

Nor would a distribution of settlement proceeds to the Plans inure to the benefit of AIG. The most that can be said is that a settlement recovery by the

Retirement Plan, which is a defined benefit pension plan rather than a defined contribution plan, could reduce AIG's contribution obligation. But AIG would still lack any direct or indirect control over any assets recovered by the Retirement Plan under the settlement. *See, e.g.*, 29 U.S.C. §§ 1106, 1002(14)(C) (prohibiting financial transactions between a plan and "an employer any of whose employees are covered by such plan"). And AIG would also lack control over any investment decisions concerning any recovered assets for the defined contribution plans, as those decisions must be made solely by the participants themselves. *See* 29 U.S.C. § 1104(c)(1)(A). In short, AIG would enjoy no added benefit if the Plans are included in the Settlement Class.

Our conclusion also makes sense by viewing the word "affiliate" in the full context of the exclusion provision. The term "affiliate" directly follows the terms "parent" and "subsidiary," and directly precedes the terms "officer" and "director." These specific terms have precise and commonly understood definitions in corporate law. *See, e.g.*, Del Code Ann., tit. 8, §§ 141-46 (discussing the roles of officers and directors); Del. Code Ann., tit. 8, § 220 (defining subsidiary as "any entity directly or indirectly owned, in whole or in part, *by the corporation of which the stockholder is a stockholder and over the affairs of which the*

*corporation directly or indirectly exercises control, and includes, without limitation,* corporations, partnerships, limited partnerships, limited liability partnerships, limited liability companies, statutory trusts and/or joint ventures" (emphasis added)). The exclusion of "parents," "subsidiaries," "officers," and "directors" of AIG from the settlement class evinces an intent to exclude individuals who may have perpetrated or benefited from the alleged underlying securities violations. And because we often interpret a word "by the company it keeps (the doctrine of *noscitur a sociis* )," the district court's interpretation of the term "affiliate" to include the Plans "ascribe[s] [to it] . . . a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *see also WPP Luxembourg Gamma Three Sarl v. Spot Runner Inc.*, 655 F.3d 1039, 1051 & n.3 (9th Cir. 2011) (applying the noscitur a sociis canon to the interpretation of a contract).

Consider, for example, two different employees who both work in the mailroom at AIG. One employee participated in one of the Plans; the other, chose not to do so, but purchased AIG common stock on the open market during the class period. Neither employee had any role in the alleged securities violations underlying this class action. Following the district court's logic, despite being

38

nearly identical plaintiffs suffering the same injury, the first employee would be excluded from the settlement class whereas the latter would be included. And although the employee participating in the Plans has a secondary recourse by bringing an action under ERISA, that separate statutory right does not deprive him or her of the protections of the securities laws.

Finally, the district court's interpretation of the term "affiliate" would also strain drafters of settlement agreements in future securities class actions. Were the district court's interpretation to stand, we would expect plan fiduciaries to make an effort to ensure their plan is not excluded from a securities class action. Drafters could be forced into the uncomfortable position of writing language that would *exclude* "affiliates," but *include* employer-sponsored plans. No doubt many dollars would be spent, and many hours would pass, as courts needlessly faced even more complicated interpretive thickets than the one we have before us today. It is better to avoid this altogether and interpret the term "affiliate" in the context of the exclusion provision: to exclude entities that could conceivably profit despite their own possible participation in the alleged securities violations. But if drafters *do* want to exclude employer-sponsored plans, they can simply say so.

**III**

Appellants urge us to also find that Rust erred by denying the Plans' claims on the basis that "the claim was submitted on a 'participant-level' and [ ] because it appears the participants did not directly purchase and sell 'AIG Securities[.]'" Appellant's Br. at 49. As noted above, the number of AIG shares that the Defined Contribution Plans purchased on the open market during the class period (the plan level calculation) could, in theory, be lower than the number of shares participating employees elected to acquire (the participant level calculation), perhaps yielding a lower Recognized Loss under the Settlement Agreements. That appears in fact to be the case: According to Rust, the Plans' combined Recognized Loss would be $200.6 million if calculated at the participant-level (where possible) but only $81.5 million if calculated at the plan-level. Declaration of Eric Shacter, September 30, 2013, at ¶ 24, App'x at 2958. Appellants assert that "[b]y refusing to accept participant-level claims from the Defined Contribution Plans, Rust has acted to reduce the Defined Contribution Plans' potential recovery by treating them differently from all other AIG shareholders, thereby artificially inflating the potential recovery for the other class members, including the Appellees, who are the lead plaintiffs." *Id*.

40

Because the district court did not reach this question, we remand so that the court may consider it in the first instance. *See Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1317 (2d Cir. 1991) ("It is a general rule that a federal appellate court does not consider an issue not passed upon below." (internal quotation marks omitted)).

**CONCLUSION**

For the foregoing reasons, we DISMISS the appeal of the district court's denial of the motion to intervene as moot, and the district court's order denying the Plans' motion to direct is VACATED and the case is REMANDED for further proceedings in accordance with this opinion.